UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

FILED

NOV 3 0 2015

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY _____
DEPUTY CLERK

| | | |
|---|---|---|
| DAVID RODRIGUEZ,<br>No. 746546,<br><br>Plaintiff,<br><br>V.<br><br>BEXAR COUNTY HOSPITAL DISTRICT<br>d/b/a UNIVERSITY HEALTH SYSTEM,<br>BEXAR COUNTY, TEXAS,<br>JONATHAN GARCIA, Badge no. 1777,<br>Deputy Bexar County Sheriff,<br>KEISHA Last Name Unknown,<br>University Hospital Nurse's Aide,<br>JAMES Last Name Unknown,<br>University Hospital Nurse's Aide, and<br>CHERYL ANN SUMMERVILLE,<br>University Hospital Nurse,<br><br>Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | CIVIL NO. SA-14-CA-861-OG |

## MEMORANDUM OPINION AND ORDER

The matters before the Court are (1) defendant Garcia's motion to dismiss, filed June 18, 2015 (ECF no. 38), (2) defendant Summerville's motion to dismiss, filed June 3, 2015 (ECF no. 27), (3) defendant Bexar County's motion to dismiss, filed September 16, 2015 (ECF no. 81), (4) defendant University Health System's motion to dismiss or, alternatively, motion for summary judgment, filed September 18, 2015 (ECF no. 83), and (5) plaintiff's claims against the two incompletely identified nurse's aides listed in plaintiff's original complaint. On August 14, 2015, this Court advised the parties it would treat defendants Garcia's and Summerville's motions to dismiss as motions for summary judgment (ECF nos. 53 & 54).

For the reasons set forth below, (1) defendants Garcia's and Summerville's motions for summary judgment will be granted, (2) the remaining defendants' motions for summary judgment and motions to dismiss will be granted, and (3) all of plaintiff's claims against the two nurse's aides incompletely identified in plaintiff's original complaint and response to this Court's Show Cause Order will be dismissed as legally frivolous.

## I. Background & Procedural History

Plaintiff filed a highly detailed original Section 1983 civil rights complaint in this Court on September 29, 2014 (ECF no. 1).[1] After the Court twice directed plaintiff to respond to a Show

---

[1] In his original complaint in this lawsuit, plaintiff alleges that (1) on September 25, 2012 plaintiff was in the custody of the BCADC but admitted to the University Hospital on Medical Drive for treatment of injuries he sustained during his arrest, (2) he witnessed a Bexar County Deputy Sheriff named Fikes or Fikks who appeared to be intoxicated (the deputy was belligerent, made threats against plaintiff, slurred his words, and the deputy later laid down in a hospital bed where he passed out and was unresponsive to attempts by hospital staff to communicate with him), (3) when plaintiff notified a nurse named "Cheri" and another deputy named Ochoa of what plaintiff had witnessed, deputy Ochoa became angry with plaintiff , (4) two men in suits later videotaped deputy Fikes or Fikks but were unable to waken the sleeping or passed out deputy, (5) plaintiff told deputy Ochoa and the two men in suits he would forget what he had seen, (6) following a shift change a deputy J. Garcia arrived at the hospital and began threatening plaintiff, i.e., deputy Garcia called plaintiff a baby killer and threatened to kill plaintiff once plaintiff reached the jail, (7) deputy Garcia conspired with a nurse's aid named "Keisha" to move the security camera pointed at plaintiff in another direction so as to allow Garcia to later claim plaintiff was behaving in a disruptive manner, (8) deputy Garcia asked several nurses and other deputies to use a stun gun on plaintiff but they declined, (9) every time plaintiff felt threatened by deputy Garcia he hit the nurse call button, (10) plaintiff overheard deputy Garcia tell nurse aide "Keisha" that he wanted to stun plaintiff but plaintiff was in contact with an aluminum commode and the stun gun might electrocute plaintiff, so plaintiff remained in close contact with the commode, (11) he overheard deputy Garcia and nurse's aid Keisha conspiring to tell others plaintiff had thrown urine at Garcia, (12) after plaintiff relieved himself in a bedside urinal, nurse's aid Keisha later returned with a syringe filled with urine and threatened to inject same into plaintiff's arm but did not actually do so, (13) plaintiff later overheard nurse's aid Keisha tell deputy Garcia she had food out of the trash and placed it on plaintiff's food tray, (14) when plaintiff opened a sealed container of pineapples, they smelled rancid, so plaintiff did not eat them, (15) deputy Garcia threatened again to kill plaintiff, (16) plaintiff later managed to talk with Garcia and calm Garcia down,  (17) a female deputy named Leal arrived to transport

plaintiff to jail and berated deputy Garcia for treating plaintiff uncivilly, (19) Garcia again threatened plaintiff, (19) "Leal told him to the car and take a shot about three times," (20) nurse's aid Keisha again moved the security camera so Garcia would be able to say plaintiff was combative, (21) a nurse named Cheryl Ann and a deputy named E. Garcia later entered plaintiff's room and forced plaintiff to take a medication in the form of a pink sugar cube, (22) deputy J. Garcia threatened to punch plaintiff so plaintiff took the medication, which plaintiff later learned was "Risperdal," [sic] a medication used to treat psychosis, a condition plaintiff alleges he has never experienced, (23) later, nurse Cheryl Ann and deputies J. Garcia and E. Garia returned and forced plaintiff to take another dose of Risperdal, (24) nurse Cheryl Ann later brought plaintiff a cup of water into which she had placed a dirty body wipe plaintiff had used to wipe down his body and plaintiff drank from the cup before noticing the dirty body wipe contained therein, (25) deputy J. Garcia later began making more threats to take plaintiff to a ranch and shoot up plaintiff with drugs and break off the needles in plaintiff's body to make it look as if drug gangs had murdered plaintiff, (26) nurse Cheryl Ann informed deputy J. Garcia that a drug overdose or poisoning could be covered up by injecting saline into a body, (27) deputy J. Garcia told plaintiff he was going to place plaintiff in a dog cage or kennel and even brought a dog cage or kennel into the hospital and left it just outside plaintiff's door, (28) deputy J. Garcia ordered plaintiff three times to get into a wheel chair for transport to the jail, (29) as soon as plaintiff got into the wheel chair, deputy J. Garcia would tell plaintiff he was not going anywhere, (30) after those three incidents, plaintiff informed deputy J. Garcia that he would not get into the dog kennel, (31) deputy J. Garcia called plaintiff a baby killer and threatened to smash plaintiff's surgically repaired leg to pieces, (32) plaintiff hopped on one leg and slammed his door closed, (33) deputy J. Garcia then came through the door and "spear tackled plaintiff like football player," which shattered plaintiff's femur and bent the metal hardware that had been surgically implanted in plaintiff's leg, (34) plaintiff then "defended himself" by getting Garcia off of him and holding him down, (35) plaintiff then noticed his injured leg was bent and deformed, (36) several other officers (deputy Fikes/Fikks, E. Garcia, and a GEO correctional officer named Rodriguez) entered the room and held plaintiff down by the neck until plaintiff could not breathe, (37) deputies J. Garcia and Fikes/Fikks stood plaintiff up outside plaintiff's hospital room, (38) deputy J. Garcia directed plaintiff to walk and threatened plaintiff when plaintiff demanded a wheelchair, (39) plaintiff attempted to take a step but felt his leg buckle and pain, (40) deputies Fikes/Fikks and J. Garcia began dragging plaintiff to the holding cell along with the dog kennel while plaintiff screamed his name and told anyone who could hear him that if he were later found dead the deputies had killed him, (41) plaintif was placed in a small cell and told to shut up, (42) deputy Fikes/Fikks and J. Garcia then began demanding that plaintiff give them deputy J. Garcia's keys and directed plaintff to take off his leg brace and hand wrap, (43) nurse's aid Keisha began to crush pills on a table, (44) deputy J. Garcia later found his keys in his own shirt pocket, (45) a female nurse came in and demanded to know what was going on, (46) when plaintiff told her, she informed the deputies that plaintiff's leg was broken and she needed to treat plaintiff, (47) nurse's aid Keisha and deputies Fikes/Fikks and J. Garcia and someone named "James" informed the other female nurse that plaintiff had been combative and she could not treat plaintiff, (48) the female nurse was allowed to examine plaintiff and told the deputies they

Cause Order (ECF nos. 4 & 14), plaintiff did so on April 2, 2015 (ECF no. 19). In an Order issued

May 5, 2015 (ECF no. 23), this Court directed service on those defendants who could reasonably be

identified.  On June 3, 2015, defendant Summerville, previously identified by plaintiff only as

"Cheryl Ann Last Name Unknown," filed a motion to dismiss in which she asserted, among other

defenses, the doctrine of qualified immunity (ECF no. 27).   Plaintiff filed a response to said

defendant's motion on June 18, 2015 (ECF no. 36).  Also on June 18, 2015, defendant Garcia filed

a motion to dismiss in which he also raised the defense of qualified immunity, as well as other

defenses (ECF no. 38).  Plaintiff responded to this motion on July 14, 2015 (ECF no. 40).  In a pair

of Orders issued August 14, 2015 (ECF nos. 53 & 54), the Court (1) advised the parties that

defendants' Garcia's and Summerville's motions to dismiss would be treated as motions for

summary judgment, (2) explained summary judgment procedure and proof for the benefit of the pro

---

could not place plaintiff in the dog kennel, (49) deputy Fikes/Fikks directed deputy J. Garcia ty
leave and deputy J. Garcia took the dog kennel when he left, (50) nurses aids Keisha and James
and deputy Fikes/Fikks took plaintiff to a room where James tied plaintiff to a hospital bed with
thin rope, (51) nurse's aid Keisha later brought plaintiff a cup of water that tasted like Risperdal,
(52) a female in a white doctor's coat came into plaintiff's room and gave plaintiff an injection in
each arm and plaintiff slept for three days, (53) by the time plaintiff awoke, the bumps on his
head from his fight with deputy J. Garcia were gone but there were rope burns on plaintiff's
wrists, (54) plaintiff was given Risperdal, Ativan and Haldol and released from the hospital to
the BCADC on September 29, 2012 "unchecked for injuries," (55) plaintiff was examined by a
surgeon at the hospital on October 16, 2012, (56) during the 21 days between plaintiff's initial
hospital release and his examination on October 16, plaintiff's leg was visibly deformed and
crooked, (57) the surgeon who examined plaintiff on October 16, 2012 informed plaintiff that he
needed immediate surgery and was at risk of needing his leg amputated, (58) surgery was again
performed on plaintiff's leg on October 19, 2012, (59) ( a post operative infection forced plaintiff
to remain in the hospital for a month, during which time deputy J. Garcia harassed plaintiff daily,
and (60) plaintiff has yet another surgery on February 8, 2013 to further correct the problems
with his broken leg resulting from the actions of deputy J. Garcia, who continues to harass
plaintiff.

se plaintiff, and (3) directed the parties to file their summary judgment evidence supporting or opposing those defendants' motions by September 25, 2015.

The defendant identified by the pro se plaintiff as "Bexar County Adult Detention Center" (liberally construed by this Court as an attempt to bring suit against Bexar County, Texas[2]) filed a motion to dismiss (ECF no. 81). The defendant identified by plaintiff as "University Health System" (liberally construed by this Court as an attempt to bring suit against the Bexar County Hospital District d/b/a University Health System) filed a motion to dismiss and, alternatively, for summary judgment (ECF no. 83). Pursuant to the Prisoner Mailbox Rule, plaintiff filed his unsworn, unverified, responses to both those motions on October 13, 2015 (ECF nos. 104 & 105).[3]

The Court has reviewed the objections to various portions of the purported summary judgment evidence filed by the parties and advises the parties it will disregard any submissions which do not satisfy the standard for proper summary judgment evidence set forth in Rule 56, FED.R.CIV.P., as explained in the Magistrate Judge's Orders of August 14, 2015. For the reasons discussed at length below, in the course of reviewing defendants' motions for summary judgment, the Court will disregard any and all (1) quotations from unauthenticated trial transcripts and incident

---

[2] The Bexar County Adult Detention Center is not a jural entity which can sue or be sued; it is a building owned and operated as a local detention facility by Bexar County, Texas. *See Darby v. Pasadena Police Dept.*, 939 F.2d 312, 313-14 (5th Cir. 1991) (holding municipal police department in Texas home rule city could not be sued or bring suit in its own name - city was the proper defendant and suit against police department could properly be dismissed).

[3] "In *Houston v. Lack*, the Supreme Court held that a pro se prisoner's notice of appeal under Federal Rule of Appellate Procedure 4(a)(1) is deemed filed as of the date it is delivered to prison officials for mailing. 487 U.S. 266, 270, 108 S.Ct. 2379, 101 L.Ed.2d 245 (1988)." *Richards v. Thaler*, 710 F.3d 573, 576 (5th Cir. 2013). "The Fifth Circuit has extended this rule, the 'prison mailbox rule,' to other submissions of pro se inmates. *See, e.g., Spotville v. Cain*, 149 F.3d 374, 378 (5th Cir.1998) (holding § 2254 applications deemed filed on date inmate tenders petition to prison officials for mailing)." *Id.*

reports, (2) factual assertions in unsworn pleadings,[4] (3) factual assertions in purported affidavits not

based upon the purported affiant's personal knowledge, and (4) other materials which have not been

properly authenticated or otherwise presented to the Court in proper summary judgment form.[5] The

---

[4] For instance, plaintiff filed a trio of unsworn pleadings on April 2, 2015 (ECF nos. 17-19) and a pair of unsworn "advisories" (ECF nos. 86-87), none of which are verified, sworn, or submitted in conformity with Title 28 U.S.C. § 1746. Petitioner did include an "unsworn declaration" certificate at the end of ECF no. 20 but plaintiff did not sign this instrument. Plaintiff filed a 28-page unsworn pleading on July 14, 2015 (ECF no. 40) in response to defendant Garcia's motion to dismiss to which he attached copies of BCADC grievance forms and a five-page unsworn "affidavit and petition" along with a one-page "unsworn declaration" which does not clearly refer back to any of the allegations or other documents contained in that pleading except possibly the "affidavit and petition." Thus, these documents do not constitute proper summary judgment evidence.

Likewise, while plaintiff's Original Complaint is properly sworn under penalty of perjury, plaintiff attached a nine-page pro se "affidavit" thereto which is not executed under penalty of perjury and does not otherwise comply with the provisions of 28 U.S.C. § 1746 regarding unsworn declarations. Thus, only plaintiff's Original Complaint and not the "affidavit" attached thereto constitutes proper summary judgment evidence.

[5] As explained in Section V below, the requirements for proper summary judgment evidence require proper authentication of all documents presents. The USB drive plaintiff included with his pleading filed April 20, 2015 (ECF no. 22) was not accompanied by any authenticating documentation establishing the files in question are what they purport to be. The only unsworn declaration contained in ECF no. 22 does not purport to authenticate either the medical records included in that filing or the contents of the USB drive submitted by plaintiff with that pleading. The letter dated July 17, 2014 from attorney Joanne Eakle accompanying the USB drive is not sworn, verified, or otherwise sufficient to authenticate the contents of the files on the USB drive for summary judgment purposes. Nothing in ECF no. 22 establishes that plaintiff or attorney Eakle has ever had personal knowledge of the medical diagnoses and other observations contained in plaintiff's surgeon's notes or in the files contained on the USB drive plaintiff furnishes to the Court. Thus, neither plaintiff's conclusory unsworn declaration nor attorney Eakle's unsworn letter properly authenticate either of those groups of information for purposes of summary judgment review. Furthermore, the password furnished in attorney Eakle's letter does not allow access to the medical records file contained on the USB drive. This Court may not consider any of the information contained the USB drive for purposes of resolving the pending motions for summary judgment.

Fortunately, the medical records accompanying plaintiff's filing of April 20, 2015 (ECF no. 22) are copies of portions of the properly authenticated medical records filed by defendants as parts of ECF nos. 68 and 71. The Court will be able to consider all of the plaintiff's medical records, including the notes from plaintiff's surgeon, which plaintiff attached to his filing of

Court will review plaintiff's claims against defendants Garcia, Summerville, and the Bexar County Hospital District d/b/a University Health System under the Rule 56, FED.R.CIV.P., standard. The Court will review plaintiff's claims against defendant Bexar County within the context of Rule 12(b)(6), Fed.R.Civ.P. The Court will review plaintiff's claims against the two incompletely identified nurse's aides under the standard set forth in 28 U.S.C. Sections 1915(e) and 1915A(b).

## II. <u>Section 1983 Generally</u>

Title 42 U.S.C. Section 1983 does not create any substantive rights, but instead was designed to provide a remedy for violations of federal statutory and constitutional rights. *Sepulvado v. Jindal*, 729 F.3d 413, 420 n.17 (5th Cir. 2013), *cert. denied,* 134 S. Ct. 1789 (2014); *Southwestern Bell Telephone, LP v. City of Houston*, 529 F.3d 257, 260 (5th Cir. 2008); *Hernandez ex rel. Hernandez v. Texas Department of Protective and Regulatory Services*, 380 F.3d 872, 879-80 (5th Cir. 2004); *Flores v. City of Palacios*, 381 F.3d 391, 404 (5th Cir. 2004); *LaFleur v. Texas Department of Health*, 126 F.3d 758, 759 (5th Cir. 1997); *Jackson v. City of Atlanta, Tex.*, 73 F.3d 60, 63 (5th Cir. 1996), *cert. denied*, 519 U.S. 818 (1996).

There are two essential elements to a Section 1983 action: (1) the conduct in question must be committed by a person acting under color of state law; and (2) the conduct must deprive the plaintiff of a right secured by the Constitution or the laws of the United States. *Whitley v. Hanna*, 726 F.3d 631, 638 (5th Cir. 2013), *cert. denied*, 134 S. Ct. 1935 (2014); *Romano v. Greenstein*, 721

---

April 20, 2015 (ECF no. 22). Because they are numbered sequentially, for ease of reference and to avoid confusion and redundancy, the Court will refer to the plaintiff's BCADC and UHS medical records attached to ECF nos. 68 and 71 by the page numbers at the bottom of those collections of medical records. Finally, the video file contained on plaintiff's USB drive is identical to the video file contained on the CD-ROM filed with a proper authentication affidavit by defendant Garcia as ECF no. 60. The contents of that video file will be discussed below in connection with plaintiff's claims against defendant Garcia.

F.3d 373, 377 (5th Cir. 2013); *Wyatt v. Fletcher*, 718 F.3d 496, 517 (5th Cir. 2013); *Doe ex rel.*

*Magee v. Covington County School District*, 675 F.3d 849, 854 (5th Cir. 2012); *D.A. ex rel. Latasha*

*A. v. Houston Independent School District*, 629 F.3d 450, 456 (5th Cir. 2010); *Doe v. Dallas I.S.D.*,

153 F.3d 211, 215 (5th Cir. 1998); *Randolph v. Cervantes*, 130 F.3d 727, 730 (5th Cir. 1997), *cert.*

*denied*, 525 U.S. 822 (1998); *Leffall v. Dallas I.S.D.*, 28 F.3d 521, 525 (5th Cir. 1994); *Resident*

*Council of Allen Parkway Village v. U.S. Department of Housing and Urban Development*, 980 F.2d

1043, 1050 (5th Cir. 1993), *cert. denied*, 510 U.S. 820 (1993); *Martin v. Thomas*, 973 F.2d 449, 452-

53 (5th Cir. 1992); *Augustine v. Doe*, 740 F.2d 322, 324-25 (5th Cir. 1984). *See also Walker v. City*

*of Bogalusa*, 168 F.3d 237, 240 (5th Cir. 1999) (holding a constitutional claim of discrimination

requires proof of purposeful discrimination; disparate impact is insufficient; and the absence of

discriminatory purpose precludes a constitutional violation).

In order to state a cause of action under Section 1983, a plaintiff must allege facts

establishing that an otherwise private defendant acted "under color" of state law. *Rundus v. City of*

*Dallas, Texas*, 634 F.3d 309, 312 (5th Cir.) (to show there is state action by an otherwise private

entity, the plaintiff must show either (1) the private entity's action represents an official-City policy

or custom or (2) the defendant's action in enacting and enforcing the restriction is "fairly

attributable" to the City), *cert. denied*, 132 S. Ct. 107 (2011); *Castro Romero v. Becken*, 256 F.3d

349, 354 (5th Cir. 2001) (holding no §1983 liability could exist with regard to private defendants

absent allegations the non-governmental defendants acted in concert with a governmental entity to

deprive the plaintiff of his rights); *Brummett v. Camble*, 946 F.2d 1178, 1184 (5th Cir. 1991), *cert.*

*denied*, 504 U.S. 965 (1992); *Auster Oil & Gas, Inc. v. Stream*, 764 F.2d 381, 386-88 (5th Cir. 1985),

*cert. denied*, 488 U.S. 848 (1988).  Stated somewhat differently, a claim for relief under 42 U.S.C.

8

§ 1983 must contain two elements: (1) that plaintiff has been deprived of a right secured by the Constitution or laws of the United States; and (2) that the defendant acted under color of state law. *Kovacic v. Villarreal*, 628 F.3d 209, 213 (5th Cir. 2010), *cert. denied*, 131 S. Ct. 2995 (2011); *Bustos v. Martini Club Inc.*, 599 F.3d 458, 464 (5th Cir. 2010) (a person acts under color of state law if he misuses "power" possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law); *Randolph v. Cervantes*, 130 F.3d at 730; *Doe v. Rains County Independent School District*, 66 F.3d 1402, 1406 (5th Cir. 1995); *Leffall v. Dallas I.S.D.*, 28 F.3d at 525; *Resident Council of Allen Parkway Village v. U.S. Department of Housing and Urban Development*, 980 F.2d at 1050; *Martin v. Thomas*, 973 F.2d at 552-53; *Fyfe v. Curlee*, 902 F.2d 401, 403 (5th Cir. 1990), *cert. denied*, 498 U.S. 940 (1990); *Wong v. Stripling*, 881 F.2d 200, 202 (5th Cir. 1989).

> Whether an officer is acting under color of state law does not depend on his on- or off-duty status at the time of the alleged violation. Rather, the court must consider: (1) whether the officer "misuse[d] or abuse[d] his official power," and (2) if "there is a nexus between the victim, the improper conduct, and [the officer's] performance of official duties." If an officer pursues personal objectives without using his official power as a means to achieve his private aim, he has not acted under color of state law.

*Bustos v. Martini Club Inc.*, 599 F.3d at 464-65 (*footnotes omitted*).

Thus, not all actions of a state official are necessarily taken under color of state law; where the actor's motivation was personal and the actor did not invoke or use any official authority, there is an absence of a showing of action "under color of state law." *Bryant v. Military Department of Mississippi*, 597 F.3d 678, 686-87 (5th Cir.), cert. denied, 562 U.S. 893 (2010).

Insofar as plaintiff complains that the defendants failed to comply with a variety of state statutes and code provisions, including various provisions of the Texas Penal Code, that claim is *non*

9

*sequitur*. Absent some showing that the defendants violated plaintiff's *federal* constitutional rights, complaints about the violation of state statutes or state agency regulations are insufficient as a matter of law to support a claim for relief under Section 1983. *See Jones v. Lowndes County, Mississippi*, 678 F.3d 344, 352 (5th Cir. 2012) ("[A]n alleged violation of a state statute does not give rise to a corresponding § 1983 violation, unless the right encompassed in the state statute is guaranteed under the United States Constitution."); *Black v. Warren*, 134 F.3d 732, 734 (5th Cir. 1998) (holding alleged violations of TDCJ procedural rules regarding notice and the right to call witnesses and present documentary evidence at a disciplinary hearing did not present an arguable basis to support a due process claim); *Myers v. Klevenhagen*, 97 F.3d 91, 94 (5th Cir. 1996) (holding a prison official's failure to follow the prison's own policies, procedures, and regulations does not constitute a violation of due process if constitutional minima are nevertheless met); *Giovanni v. Lynn*, 48 F.3d 908, 912 (5th Cir. 1995) (holding a mere failure to accord procedural protection called for by state law or regulation does not of itself amount to a denial of due process), *cert. denied*, 516 U.S. 860 (1995); *Murphy v. Collins*, 26 F.3d 541, 543 (5th Cir. 1994) (holding a state's failure to follow its own procedural regulations does not constitute a violation of due process if constitutional minima are met); *Murray v. Mississippi Department of Corrections*, 911 F.2d 1167, 1168 (5th Cir. 1990) (holding alleged violations of a state statute did not give rise to federal constitutional claims), *cert. denied*, 498 U.S. 1050 (1991); *Jackson v. Cain*, 864 F.2d 1235, 1251 (5th Cir. 1989) ("A state's failure to follow its own procedural regulations does not establish a violation of due process, because 'constitutional minima may nevertheless have been met.'"); *Brown v. Texas A&M University*, 804 F.2d 327, 335 (5th Cir. 1986) (holding a state agency's violations of its own internal regulations did not establish a Due Process violation or otherwise give rise to a constitutional claim). Thus, insofar

as plaintiff alleges merely that the defendants failed to comply with state jail rules and regulations, state penal statutes, or state civil statutes, those allegations, standing alone, do not provide even an arguable basis for recovery or a for a finding that plaintiff is entitled to any relief under Section 1983.

Plaintiff's complaints that the defendants violated Title 18 U.S.C. § 421 and 28 C.F.R. § 549.43 are also *non sequitur*.[6] There is no Section 421 contained within Title 18 of the United States Code.[7] The provision from the Code of Federal Regulations cited by plaintiff applies only to the transfer of *federal* prisoners within the federal Bureau of Prisons: "The Bureau may transfer an inmate to a suitable facility for psychiatric or psychological examination to determine whether hospitalization in a suitable facility for psychiatric care or treatment is needed." 28 C.F.R. § 549.43. Plaintiff has alleged no specific facts and presented no proper summary judgment evidence showing that, at the time of the events giving rise to his Section 1983 claims, he was a federal criminal defendant or otherwise in the custody of the federal Bureau of Prisons. "Section 1983 provides a cause of action for violations of federal statutes as long as the statute (1) creates an enforceable right and (2) does not foreclose enforcement under § 1983." *Romano v. Greenstein*, 721 F.3d at 377 (*citing Wilder v. Virginia Hospital Association*, 496 U.S. 498, 508, 110 S. Ct. 2510, 2517, 110 L. Ed. 2d 455 (1990)). Plaintiff has not identified a federal statute which creates an enforceable right

---

[6] Plaintiff made these assertions in his "unsworn declaration by inmate," filed June 18, 2015 (ECF no. 36) and repeated the same assertions in another pleading filed July 14, 2015 (ECF no. 40) but in a portion of the latter pleading which was not properly verified or sworn.

[7] Plaintiff's citation may be an attempt to refer to 18 U.S.C. Section 4241, which addresses the procedures to be employed to determine the mental competency of *federal* criminal defendants and *federal* prisoners. Plaintiff has furnished this Court with no factual allegations, much less any proper summary judgment evidence, showing that, at any time relevant to his claims herein, he was being held in federal custody by federal law enforcement authorities. Thus, plaintiff has neither alleged any facts not furnished any summary judgment evidence showing Section 4241 has any application to plaintiff's claims herein.

which was violated by any identified conduct on the part of any of the defendants herein. Thus, plaintiff's citations to a nonexistent federal statute and a provision of the Code of Federal Regulations which applies to *federal* prisoners within the custody of the Bureau of Prisons do not furnish even an arguable basis for relief against any of the named defendants under Section 1983.

A prisoner seeking to recover a judgment under Section 1983 must exhaust available administrative remedies before resort to the federal courts. See *Clifford v. Gibbs*, 298 F.3d 328, 330 (5th Cir. 2002) ("Section 1997e(a), as amended by the Prison Litigation Reform Act (PLRA), provides that '[n]o action shall be brought with respect to prison conditions under section 1983 .... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.' Clifford had argued that § 1997e(a) did not apply to his failure-to-protect claim because the claim did not concern 'prison conditions.' However, since Clifford brought his claim, the Supreme Court decided *Porter v. Nussle,* which held that 'the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong.'" 534 U.S. 516, 122 S. Ct. 983, 992, 152 L. Ed. 2d 12 (2002).). Plaintiff does not allege any specific facts, nor has plaintiff presented any proper summary judgment evidence showing, he has exhausted available administrative remedies with regard to his complaints that (1) defendant Summerville furnished plaintiff water in a drinking cup containing a soiled body wipe, (2) defendant Summerville forced plaintiff to take antipsychotic medications, (3) defendant Keisha last name unknown threatened to inject plaintiff with a syringe filled with urine, (4) defendant James last name unknown placed plaintiff in restraints as punishment for plaintiff's altercation with defendant Garcia, and (5) plaintiff was forced to remain in restraints and take antipsychotic medications against his will

for sixty-two consecutive hours.  Thus, these complaints do not furnish a basis for relief under Section 1983.

Finally, mere negligence by a state official or employee does not give rise to Section 1983 liability. *Daniels v. Williams*, 474 U.S. 327, 332-35, 106 S. Ct. 662, 665-67, 88 L. Ed. 2d 662 (1986). A showing of merely negligent conduct by an official is insufficient to overcome the defense of qualified immunity. *Whitley v. Hanna*, 726 F.3d at 643 ("Actions and decisions by officials that are merely inept, erroneous, ineffective, or negligent do not amount to deliberate indifference and thus do not divest the official of qualified immunity."); *Zarnow v. City of Wichita Falls, Texas*, 500 F.3d 401, 410 (5th Cir. 2007 (negligence will not support the denial of qualified immunity); *Estate of Davis ex rel. McCully v. City of North Richland Hills*, 406 F.3d 375, 381 (5th Cir. 2005) (holding the same).  Negligent failure to supervise or train does not satisfy the "deliberate indifference" standard and will likewise not support a Section 1983 claim against a municipal entity. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 392, 109 S. Ct. 1197, 1206, 103 L. Ed. 2d 412 (1989) (holding only a showing of deliberate indifference by municipal policy makers will support Section 1983 liability based on a failure-to-train claim); *Zarnow v. City of Wichita Falls, Texas*, 614 F.3d 161, 170 (5th Cir. 2010) ("'Unintentionally negligent oversight' does not satisfy the deliberate indifference standard."), *cert. denied*, 131 S. Ct. 3059 (2011); *Valle v. City of Houston*, 613 F.3d 536, 542 (5th Cir. 2010) (holding the same), *cert. denied*, 131 S. Ct. 2094 (2011).  Thus, insofar as plaintiff alleges employees of the Bexar County Hospital District d/b/a University Health System or at the BCADC *negligently* failed to examine, properly diagnose, or treat any of his physical or mental impairments,  those allegations do not furnish a basis for relief under Section 1983.

13

### III. <u>Rule 12(b)(6) Motions to Dismiss</u>

The pleading standard set forth in Rule 8(a)(2), FED.R.CIV.P., (which requires only "a short and plain statement of the claim showing that the pleader is entitled to relief") does not require detailed factual allegations but it does demand more than an unadorned, the-defendant-unlawfully-harmed-me accusation. *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 1964, 167 L. Ed. 2d 929 (2007). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. at 678, 129 S. Ct. at 1949; *Central States, Southeast and Southwest Areas Health and Welfare Fund ex rel. Bunte v. Health Special Risk, Inc.*, 756 F.3d 356, 360 (5th Cir. 2014). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. at 678, 129 S. Ct. at 1949; *Whitley v. Hanna*, 726 F.3d 631, 638 (5th Cir. 2013), *cert. denied*, 134 S. Ct. 1935 (2014). "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atlantic Corp. v. Twombly,* 550 U.S. at 555, 127 S. Ct. at 1965; *Central States, Southeast and Southwest Areas Health and Welfare Fund ex rel. Bunte v. Health Special Risk, Inc.*, 756 F.3d at 360. A pleading that offers "labels and conclusions" or a "formulaic recitation of the elements of a cause of action" will not do. *Ashcroft v. Iqbal*, 556 U.S. at 678, 129 S. Ct. at 1949; *Bell Atlantic Corp. v. Twombly*, 550 U.S. at 555, 127 S. Ct. at 1964-65. Nor does a complaint suffice if it renders "naked assertions" devoid of further factual enhancement. *Ashcroft v. Iqbal*, 556 U.S. at 678, 129 S. Ct. at 1949; *Bell Atlantic Corp. v. Twombly*, 550 U.S. at 557, 127 S. Ct. at 1966.

### IV. Plaintiff's Federal Civil Rights Claims Against Bexar County

Plaintiff has brought claims against Bexar County, Texas, which has filed a motion to dismiss pursuant to Rule 12(b)(6), Fed.R.Civ.P. As explained below, plaintiff's original complaint and supplemental pleadings effectively name Bexar County, Texas as a defendant but allege no specific facts showing that any alleged injury to plaintiff or alleged violation of plaintiff's federal constitutional rights was actually caused by either (1) the personal acts or omissions of an official exercising final policymaking authority on behalf of Bexar County or (2) an official policy, procedure, widespread practice, or longstanding custom attributable to the final Bexar County policymakers.

A.       The Nature of Municipal Liability, Generally

As public officials performing discretionary tasks, individual public officers and employees such as defendants Garcia and Summerville are entitled to assert the protection of *Harlow* qualified immunity. However, local governmental entities such as cities, counties, and school districts may not assert the protection of qualified immunity. *Leatherman v. Tarrant County Narcotics Unit*, 507 U.S. 163, 166, 113 S. Ct. 1160, 1162, 122 L. Ed. 2d 517 (1993); *Kentucky v. Graham*, 473 U.S. 159, 167, 105 S. Ct. 3099, 3105-06, 87 L. Ed. 2d 114 (1985); *Brandon v. Holt*, 469 U.S. 464, 472-73, 105 S. Ct. 873, 878, 83 L. Ed. 2d 878 (1985); *Owen v. City of Independence*, 445 U.S. 622, 638, 100 S. Ct. 1398, 1409, 63 L. Ed. 2d 673 (1980); *Castro Romero v. Becken*, 256 F.3d 349, 355 (5th Cir. 2001) ("[M]unicipalities do not enjoy immunity from suit."); *Turner v. Huoma Municipal Fire and Police Civil Service Board*, 229 F.3d 478, 483 (5th Cir. 2000) (holding defenses such as qualified immunity and absolute judicial immunity do not apply to claims brought against officials in their

"official" capacities); *Burge v. Parish of St. Tammany*, 187 F.3d 452, 466 (5th Cir. 1999); *Stefanoff v. Hays County*, 154 F.3d 523, 525 (5th Cir. 1998); *Meadowbriar Home for Children v. Gunn*, 81 F.3d 521, 532 (5th Cir. 1996); *Babb v. Dorman*, 33 F.3d 472, 475 n.5 (5th Cir. 1994); *Colle v. Brazos County, Texas*, 981 F.2d 237, 244 n.36 (5th Cir. 1993); *Fields v. City of South Houston, Texas*, 922 F.2d 1183, 1191 (5th Cir. 1991).

A suit against a public official in his or her "official capacity" is, in reality, a suit against the governmental entity the official represents. *Hafer v. Melo*, 502 U.S. 21, 25, 112 S. Ct. 358, 361-62, 116 L. Ed. 2d 301 (1991); *Kentucky v. Graham*, 473 U.S. at 165-66, 105 S. Ct. at 3105; *Brandon v. Holt*, 469 U.S. at 471-72, 105 S. Ct. at 878; *Castro Romero v. Becken*, 256 F.3d at 355; *Turner v. Huoma Municipal Fire and Police Civil Service Board*, 229 F.3d 478, 483 (5th Cir. 2000); *Burge v. Parish of St. Tammany*, 187 F.3d at 466, (holding "official capacity" suits are simply another way of pleading an action against an entity of which an officer is an agent); *Brooks v. George County, Mississippi*, 84 F.3d 157, 164 (5th Cir. 1996) (holding suit against county sheriff in his official capacity was suit against County), *cert. denied*, 519 U.S. 948 (1996); *Baker v. Putnal*, 75 F.3d 190, 195 (5th Cir. 1996) (holding claims against a City Police Chief in his official capacity were really claims against the City); *Bennett v. Pippin*, 74 F.3d 578, 584-85 (5th Cir. 1996), *cert. denied*, 519 U.S. 1022 (1996); *Sanders v. English*, 950 F.2d 1152, 1159 n.13 (5th Cir. 1992). Thus, insofar as plaintiff's pro se pleadings can be liberally construed as asserting claims against of the individual defendants in their "official capacity," those claims are really directed against Bexar County and the Bexar County Hospital District d/b/a University Health System, i.e., the employers of the four individuals named as defendants.

16

B.    Municipal Liability Under Section 1983

        In order to recover a judgment against a local governmental entity under Section 1983, a

plaintiff must establish that he sustained a deprivation of constitutional or other federally-protected

rights as a result of some official policy, practice, or custom of that governmental entity. *Board of*

*County Commissioners, Bryan County, Oklahoma v. Brown*, 520 U.S. 397, 403-04, 117 S. Ct. 1382,

1388, 137 L. Ed. 2d 626 (1997); *Johnson v. Deep East Texas Regional Narcotics Trafficking Task*

*Force*, 379 F.3d 293, 309 (5th Cir. 2004) (holding that, for a municipality to be liable on account of

its policy, the plaintiff must show among other things, either (1) the policy itself violated federal law

or authorized or directed deprivation of federal rights or (2) the policy was adopted or maintained

by the municipality's policymakers with deliberate indifference as to its known or obvious

consequences); *Victoria W. v. Larpenter*, 369 F.3d 475, 482 (5th Cir. 2004); *Burge v. St. Tammany*

*Parish*, 336 F.3d 363, 369 (5th Cir. 2003); *Harris v. Victoria I.S.D.*, 168 F.3d 216, 225 (5th Cir.

1999), *cert. denied*, 528 U.S. 1022 (1999); *Doe v. Dallas I.S.D.*, 153 F.3d 211, 215-16 (5th Cir.

1998); *Spiller v. City of Texas City, Police Department*, 130 F.3d 162, 167 (5th Cir. 1997).

Although occasionally referred to as if they were three distinct creatures, a local governmental

entity's official "policies," "practices," and "customs" are really three different terms for those

actions which sufficiently bear the imprimatur of a governmental entity's final policy-makers to

justify holding the governmental entity responsible therefor. *Board of County Commissioners, Bryan*

*County, Oklahoma v. Brown*, 520 U.S. at 404-05, 117 S. Ct. at 1388-89 (holding only *deliberate*

conduct by a municipality which actually causes an injury is compensable under Section 1983);

*Spiller v. City of Texas City, Police Department*, 130 F.3d at 167; *Leffall v. Dallas I.S.D.*, 28 F.3d

521, 525 (5th Cir. 1994).

An official "policy" is most commonly defined as a policy statement, ordinance, regulation, or decision that is officially adopted or promulgated by the municipality's lawmaking officers or by an official to whom the lawmakers have delegated policy making authority. *Johnson v. Deep East Texas Regional Narcotics Trafficking Task Force*, 379 F.3d 293, 309 (5th Cir. 2004) (defining "municipal policy," in part, as a "policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by the municipality's lawmaking officers or by an official to whom the lawmakers have delegated policy-making authority); *In re Foust*, 310 F.3d 849, 861 (5th Cir. 2002) (holding a "formal policy" is a "statement, ordinance, regulation or decision that is officially adopted and promulgated by the municipality's lawmaking officers or by an official to whom the lawmakers have delegated policymaking authority"); *Baltazor v. Holmes*, 162 F.3d 368, 377 (5th Cir. 1998); *Eugene v. Alief I.S.D.*, 65 F.3d 1299, 1304-05 (5th Cir. 1995), *cert. denied sub nom. Conley v. Eugene*, 517 U.S. 1191 (1996); *Colle v. Brazos County, Texas*, 981 F.2d at 244-45; *Nobby Lobby, Inc. v. City of Dallas*, 970 F.2d 82, 92 (5th Cir. 1992); *Johnson v. Moore*, 958 F.2d 92, 94 (5th Cir. 1992); *Matthias v. Bingley*, 906 F.2d 1047, 1054 (5th Cir. 1990); *Bennett v. City of Slidell*, 735 F.2d 861, 862 (5th Cir. 1984), *cert. denied*, 472 U.S. 1016 (1985). A municipal "policy" must be a "deliberate and conscious choice" by a municipal policy-maker. *City of Canton v. Harris*, 489 U.S. 378, 389, 109 S. Ct. 1197, 1205, 103 L. Ed. 2d 412 (1989); *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483, 106 S. Ct. 1292, 1300, 89 L. Ed. 2d 452 (1986) (*plurality*); *Gonzalez v. Ysleta I.S.D.*, 996 F.2d 745, 752-60 (5th Cir. 1993); *Colle v. Brazos County*, 981 F.2d at 245; *Rhyne v. Henderson County*, 973 F.2d 386, 392 (5th Cir. 1992).

Whereas, an official "custom" or "practice" is most commonly defined as a "persistent, widespread practice of municipal officials or employees," which, although not authorized by

officially adopted and promulgated policy, is so common and well-settled as to constitute a custom

that fairly represents municipal policy; actual or constructive knowledge of such custom or practice

must be attributable to the governing body of the municipality or to an official to whom that body

has delegated policy-making authority. *Bishop v. Arcuri*, 674 F.3d 456, 467 (5th Cir. 2012) ("The

City's 'official policies,' however, include any 'persistent, widespread practice of city officials or

employees, which, although not authorized by officially adopted and promulgated policy, is so

common and well settled as to constitute a custom that fairly represents municipal policy.'");

*Johnson v. Deep East Texas Regional Narcotics Trafficking Task Force*, 379 F.3d at 309 (holding

municipal policies include persistent, widespread practices of municipal officials or employees

which, although not authorized by officially adopted and promulgated policy, are so common and

well settled as to constitute a custom that fairly represents municipal policy; actual or constructive

knowledge of such customs must be attributable to the municipality's governing body or to an

official to whom that body has delegated policy-making authority); *Burge v. St. Tammany Parish*,

336 F.3d at 369 (holding the same); *In re Foust*, 310 F.3d at 861-62 (holding a persistent,

widespread, practice of city officials or employees which, although not authorized by officially

adopted and promulgated policy, is so common and well-settled as to constitute a custom that fairly

represents municipal policy will furnish a basis for municipal liability); *McClendon v. City of

Columbia*, 258 F.3d 432, 441-42 (5th Cir. 2001) (holding that, in order to demonstrate a municipal

policy through custom, the plaintiff must allege a pattern of similar incidents in which citizens were

injured or endangered by intentional or negligent police misconduct or that serious incompetence

or misbehavior was general or widespread throughout the police force); *see also Sharp v. City of

Houston*, 164 F.3d 923, 930 (5th Cir. 1999) (holding  evidence established a municipal custom

within the police department of a "code of silence" regarding sexual harassment of female officers and of retaliation against female officers who complained about same).

C.    No Vicarious Liability for Municipalities

In *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978). the Supreme Court held that a governmental entity can be found liable under Section 1983 only if the entity itself causes the constitutional violation at issue. *Monell v. Department of Social Services of the City of New York*, 436 U.S. at 690-91, 98 S. Ct. at 2035-36; *Doe v. Dallas I.S.D.*, 153 F.3d at 215-16; *Nobby Lobby, Inc. v. City of Dallas*, 970 F.2d 82, 91 (5th Cir. 1992); *Fraire v. City of Arlington*, 957 F.2d 1268, 1277 (5th Cir. 1992), *cert. denied*, 506 U.S. 973 (1992); *Matthias v. Bingley*, 906 F.2d 1047, 1053 (5th Cir. 1990).  *Respondeat superior* or vicarious liability is not a basis for recovery under Section 1983.  *Collins v. City of Harker Heights, Texas*, 503 U.S. 115, 122, 112 S. Ct. 1061, 1067, 117 L. Ed. 2d 261 (1992); *Monell v. Department of Social Services of the City of New York*, 436 U.S. at 691-94, 98 S. Ct. at 2036-38; *Johnson v. Deep East Texas Regional Narcotics Trafficking Task Force*, 379 F.3d at 308; *Brown v. Lyford*, 243 F.3d 185, 191 (5th Cir. 2001) (holding a County may not be held liable under a *respondeat superior* theory), *cert. denied*, 534 U.S. 817 (2001) ; *Doe v. Dallas I.S.D.*, 153 F.3d at 215; *Esteves v. Brock*, 106 F.3d at 677 (holding a Texas County could not be held liable under a *respondeat superior* theory);  *Flores v. Cameron County, Texas*, 92 F.3d 258, 263 (5th Cir. 1996) (holding county liability under §1983 cannot rest on a theory of *respondeat superior*); *Grabowski v. Jackson County Public Defenders Officer*, 79 F.3d 478, 479 (5th Cir. 1996) ("The familiar doctrine of *respondeat superior* has no application in a section 1983 action against a governmental unit based on the wrongful acts of its employees."); *Baker v. Putnal*, 75 F.3d 190, 200 (5th Cir. 1996) (holding

municipalities cannot be held vicariously liable for the actions of their employees); *Rhyne v. Henderson County*, 973 F.2d 386, 392 (5th Cir. 1992) (holding the County could only be held liable for its non-policy-making employees' acts if the employees were carrying out County policies when they acted); *Benavides v. County of Wilson*, 955 F.2d 968, 972 (5th Cir. 1992) (holding that, in a Section 1983 action, a municipality may not be held strictly liable for the acts of its non-policy-making employees under a *respondeat superior* theory), *cert. denied sub nom. Bassler v. County of Wilson*, 506 U.S. 874 (1992). A municipality may not be held liable under Section 1983 solely because it employs a tortfeasor. *Board of Commissioners, Bryan County, Oklahoma v. Brown*, 520 U.S. at 403, 117 S. Ct. at 1388; *Victoria W. v. Larpenter*, 369 F.3d at 482; *Gros v. City of Grand Praire, Texas*, 181 F.3d 613, 615 (5th Cir. 1999); *Doe v. Dallas I.S.D.*, 153 F.3d at 215-16. It is only when the execution of the government's policy or custom inflicts the injury that the governmental entity may be held liable under Section 1983. *Board of Commissioners, Bryan County, Oklahoma v. Brown*, 520 U.S. at 403, 117 S. Ct. at 1388; *Victoria W. v. Larpenter*, 369 F.3d at 482; *Gros v. City of Grand Praire, Texas*, 181 F.3d at 615; *Doe v. Dallas I.S.D.*, 153 F.3d at 215-16.

In contrast, when the discretionary decisions of a local governmental official are constrained by official governmental policies not of that official's making, the official's disobedience of, or departure from, those policies is not considered an act of the governmental entity for Section 1983 purposes. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 121-22, 108 S. Ct. 915, 923, 99 L. Ed. 2d 107 (1988) (*plurality*); *McConney v. City of Houston*, 863 F.2d 1180, 1184 & n.2 (5th Cir. 1989). Thus, when a non-policy-making local governmental employee acts in a manner *inconsistent* with established governmental policy, the governmental employer cannot be held liable therefor under

Section 1983. *City of St. Louis v. Praprotnik*, 485 U.S. at 121-22, 108 S. Ct. at 923; *McConney v. City of Houston*, 863 F.2d at 1184 & n.2.

Thus, insofar as plaintiff alleges defendant Garcia acted in a manner *inconsistent* with official Bexar County policy when defendant Garcia and allegedly (1) taunted, threatened, or otherwise intentionally caused plaintiff emotional distress and (2) assaulted plaintiff on September 25, 2012 after plaintiff closed and locked his hospital room door without authorization, plaintiff fails to state a cause of action under Section 1983 against defendant Bexar County. Likewise, insofar as plaintiff alleges other Bexar County Deputy Sheriffs, including deputies Fikes, Ochoa, and E. Garcia, engaged in conduct which was *inconsistent* with official Bexar County policies or procedures, plaintiff has once again failed to allege a Section 1983 cause of action against defendant Bexar County. Bexar County may not be held liable under Section 1983 simply because it employed one or more tortfeasors who allegedly injured plaintiff.

D.    Sources of Official Policy and Acts of Final Policy-Makers

Two basic configurations can lead to a municipality's liability under Section 1983 for the acts of its officials: first, a municipality's final policy-makers are held effectively to have made policy or condoned the creation of a custom by knowingly ratifying the unconstitutional or illegal actions of subordinate officers or employees, and, second, the municipality may be held liable for the illegal or unconstitutional actions of its final policy-makers themselves as they engage in the setting of goals and the determination of how those goals will be achieved. *Turner v. Upton County, Texas*, 915 F.2d 133, 136 (5th Cir. 1990), *cert. denied*, 498 U.S. 1069 (1991).

As to the first situation, i.e., liability based upon officially-sanctioned custom or practice, isolated instances of official misconduct by a governmental entity's non-policy-making employees are inadequate to prove knowledge and acquiescence by the entity's policy-makers. *See Fraire v. City of Arlington*, 957 F.2d at 1278 (holding a city's failure to discipline a police officer for an isolated incident involving the alleged use of excessive force to effect an arrest did not give rise to an inference that the city had an official policy authorizing or encouraging police misconduct); *Rodriguez v. Avita*, 871 F.2d 552, 554-55 (5th Cir. 1989) (holding the same), *cert. denied*, 493 U.S. 854 (1989); *Palmer v. City of San Antonio*, 810 F.2d 514, 516 (5th Cir. 1987) (holding the same); *Bennett v. City of Slidell*, 728 F.2d 762, 768 n. 3 (5th Cir. 1984) ("Isolated violations are not the persistent, often repeated constant violations that constitute custom and policy."), *cert. denied*, 472 U.S. 1016 (1985); *Languirand v. Hayden*, 717 F.2d 220, 227 (5th Cir. 1983) (holding a Section 1983 plaintiff asserting police misconduct must allege a "pattern of similar incidents in which citizens were injured or endangered" by policy-consistent misconduct or that serious incompetence or misbehavior was general or widespread throughout the police force), *cert. denied*, 467 U.S. 1016 (1984). Sufficiently numerous prior incidents of official misconduct, however, may tend to prove a custom and accession to that custom by municipal policy-makers. *See Bishop v. Arcuri*, 674 F.3d at 467 ("The City's 'official policies,' however, include any 'persistent, widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy.'"); *Nobby Lobby, Inc. v. City of Dallas*, 970 F.2d 82, 92-93 (5th Cir. 1992) (holding the City could be held liable for the numerous seizures by municipal police of video and other equipment from adult video arcades over a period of two years where the police consulted with the City Attorney's office,

23

which approved same, before commencing the seizures and the seizures continued even after the City had requested a federal court to stay a lawsuit filed by arcade operators to permit the state courts to first address the state statute relied upon by the police for the seizures); *Matthias v. Bingley*, 906 F.2d 1047, 1054 (5th Cir. 1990) (holding a city could be held liable for a persistent, widespread, and longstanding practice by the police chief of failing to provide adequate notice to the lawful owners of property lawfully-seized by the police of their right to re-claim same prior to disposition thereof by the police, where responsibility for disposing of such property had been delegated by the city to the police chief).

Plaintiff alleges no specific facts showing any widespread pattern or longstanding custom or practice on the part of Bexar County's Deputy Sheriffs of either (1) intentionally causing emotional distress or (2) assaultive conduct toward persons such as plaintiff. In fact, all of plaintiff's lengthy pleadings in this cause alleging unconstitutional misconduct focus exclusively upon the conduct of Bexar County employees directed toward him alone. Thus, plaintiff has failed to allege a cause of action under Section 1983 against defendant Bexar County.

To succeed under this theory of recovery, a Section 1983 claim against a municipal entity must be based on the implementation or execution of a policy or custom which was officially adopted by that entity's official policy-makers. *Doe v. Dallas I.S.D.*, 153 F.3d at 215-16; *Meadowbriar Home for Children, Inc. v. Gunn*, 81 F.3d 521, 532 (5th Cir. 1996); *Krueger v. Reimer*, 66 F.3d 75, 76 (5th Cir. 1995). The Fifth Circuit has defined an "official policy" as "a policy statement, ordinance, regulation or decision that is officially adopted and promulgated by the municipality's lawmaking officers or by an official to whom the lawmakers have delegated policy-making authority." *Sanders-Burns v. City of Plano*, 594 F.3d 366, 380 (5th Cir. 2010); *Brown v.*

24

*Bryan County*, 219 F.3d 450, 457 (5th Cir.), *cert. denied*, 532 U.S. 1007 (2000). Plaintiff alleges no specific facts identifying any final Bexar County policymaker or policymakers whom plaintiff alleges ever adopted as official County policy the practices of intentionally inflicting emotional distress upon, and directing assaultive conduct toward, persons being held in the custody of the Bexar County Sheriff in the University Hospital's controlled access unit.

The second configuration, i.e., liability based upon the official actions of final policy-makers, has been the subject of several Supreme Court decisions since *Monell*. In *City of Oklahoma v. Tuttle,* 471 U.S. 808, 105 S. Ct. 2427, 85 L. Ed. 2d 791 (1985), a plurality of the Supreme Court held that proof of a single incident of unconstitutional activity is not sufficient to impose liability on the municipality, unless there is proof that it was caused by an existing, unconstitutional municipal policy, attributable to a final municipal policy-maker. *Tuttle*, 471 U.S. at 823-24, 105 S. Ct. at 2436. That opinion garnered the support of only its author, then-Justice Rhenquist, and then-Chief Justice Burger, and Justices White and O'Connor. Justices Brennan, Marshall, and Blackmun, concurring in the judgment in *Tuttle*, specifically rejected the implication in the plurality's opinion that only existing municipal policies could form the basis for municipal liability where the acts of an official possessing final municipal policy-making authority were at issue. *See Tuttle*, 471 U.S. at 831-32, 105 S. Ct. 2440-41. In *Pembaur v. City of Cincinnati*, 475 U.S. 469, 106 S. Ct. 1292, 89 L. Ed. 2d 452 (1986), a somewhat divided group of six Supreme Court Justices agreed that municipal liability may, under appropriate circumstances, be imposed for a single decision by final municipal policy-makers. *Pembauer v. City of Cincinnati*, 475 U.S. at 480-81, 106 S. Ct. at 1298-99. The *Pembauer* plurality, *i.e.*, Justices Brennan, White, Marshall, and Blackmun, held that a municipality may be held liable under Section 1983 for a single decision by its properly constituted legislative body,

25

regardless of whether that body had taken similar action in the past or intended to do so again in the future, because even a single decision by such a body unquestionably constitutes an act of official government policy. *See Pembauer*, 475 U.S. at 480, 106 S. Ct. at 1298. Justices Stevens and O'Connor, each writing separately, agreed with this portion of the plurality opinion. *See Pembauer*, 475 U.S. at 491, 106 S. Ct. at 1304.

It is clear in this Circuit that a single unconstitutional act by a local governmental entity's final policy-maker can subject that governmental entity to liability under Section 1983. *Bennett v. Pippin*, 74 F.3d at 586. However, that act must reflect an intentional, deliberate, decision by a final policy-maker and, where the act or omission of the final policy-maker personally did not directly cause the violation of a constitutional right, only decisions of the final municipal policy-maker which constitute a conscious disregard for a high risk of unconstitutional conduct by others can give rise to municipal liability. *Board of Commissioners, Bryan County, Oklahoma v. Brown*, 520 U.S. at 404-05, 117 S. Ct. at 1388-89. One circumstance agreed upon by the Justices in *Pembauer* where such would be the case is that which occurs where a government decision-maker possessing final authority with respect to an area of government responsibility orders or directly participates in the action that causes the alleged violation of the plaintiff's rights. *See Pembaur v. City of Cincinnati*, 475 U.S. at 481, 106 S. Ct. at 1299 ("If the decision to adopt that particular course of action is properly made by that government's authorized decision-makers, it surely represents an act of official government 'policy' as that term is commonly understood. More importantly, where action is directed by those who establish governmental policy, the municipality is equally responsible whether that action is to be taken only once or to be taken repeatedly.'"); *see also Brooks v. George County*,

Mississippi, 84 F.3d at 165 (holding a single decision by a final policy-maker within the area of his responsibility can impose liability on the responsible governmental entity).

Plaintiff has alleged no specific facts showing any personal involvement by any official or employee of Bexar County *possessing final County policymaking authority* in any of the incidents made the basis for plaintiff's claims in this lawsuit, i.e. the events which transpired at the University Hospital's controlled access unit on September 25-29, 2012 or in connection with plaintiff's allegations he was denied adequate medical care for the injuries he allegedly received during that time period, both while he remained at the hospital and after his transfer back to the Bexar County Adult Detention Center's ("BCADC's") infirmary on September 29, 2012.

In *Board of Commissioners, Bryan County, Oklahoma v. Brown,* 520 U.S. at 404-06, 117 S. Ct. at 1388-89, the Supreme Court held a County could not be held liable for a single, isolated, allegedly improper, hiring decision by the County Sheriff absent proof the hiring decision rose to the level of deliberate indifference to a plainly obvious risk that the person hired would commit the type of constitutional violation that actually resulted in the plaintiff's injury. The Fifth Circuit has applied the holding in *Brown* to deny relief to a minor school child sexually assaulted by a school district employee in the absence of proof that the decision to hire the offending employee was deliberately indifferent or proof that proper scrutiny of the employee's background would have revealed that a "plainly obvious" consequence of hiring the person would be a violation of a third-party's federally-protected rights. *Doe v. Hillsboro I.S.D.,* 113 F.3d 1412, 1416 (5th Cir. 1997). The Fifth Circuit has also held that claims against municipalities based on a *single instance of improper conduct by a municipal official,* i.e., episodic claims, must be supported by a showing that the official acted with deliberate indifference to the plaintiff's rights. *See Flores v. County of Hardeman,* 124 F.3d 736, 738

27

(5th Cir. 1997) (holding that, in an episodic act case, plaintiff must show that officer whose act or omission is challenged acted with deliberate indifference); *Scott v. Moore*, 114 F.3d 51, 54 (5th Cir. 1997) (en banc) (distinguishing between subjective episodic acts or omissions and objective municipal policies and practices).

Authority to make municipal policy may be granted directly by a legislative enactment or may be delegated by an official who possesses such authority, and whether an official has final policy-making authority is a question of state law. *McMillian v. Monroe County, Alabama*, 520 U.S. 781, 784-88, 117 S. Ct. 1734, 1736-38, 138 L. Ed. 2d 1 (1997); *Jett v. Dallas I.S.D.*, 491 U.S. 701, 737, 109 S. Ct. 2702, 2724, 105 L. Ed. 2d 598 (1989); *Pembaur v. City of Cincinnati*, 475 U.S. at 483, 106 S. Ct. at 1300 (*plurality*); *Beattie v. Madison County School District*, 254 F.3d 595, 602 (5th Cir. 2001) (an official may be a policymaker for in a particular area or on a particular issue); *Gros v. City of Grand Praire, Texas*, 181 F.3d at 617 (holding the determination as to whether an official has been delegated final policymaking authority is a question of law for the court, not one of fact for the jury); *Doe v. Dallas I.S.D.*, 153 F.3d at 216-17; *Flores v. Cameron County, Texas*, 92 F.3d at 263.   Plaintiff has alleged no specific facts identifying any person possessing final policymaking authority for Bexar County under applicable state law who had any personal involvement in, or personal knowledge of, any of the events giving rise to plaintiff's claims herein.

Identifying a final policy-maker requires examination of applicable state law regarding the legal authority possessed by local officials. *McMillian v. Monroe County, Alabama*, 520 U.S. at 786-87, 117 S. Ct. at 1737; *Gros v. City of Grand Praire, Texas*, 181 F.3d at 615-17 (holding sources of state law identifying a final policymaker include not only positive state law but also custom or usage having the force of law); *Esteves v. Brock*, 106 F.3d at 677-78 (holding the determination of

28

whether an official was acting on behalf of the state or the local government is determined by state law). Generally, final policy-makers include those local officials who, by virtue of state law, (1) hold virtually absolute sway over the particular tasks or areas of responsibility entrusted to them and (2) are accountable to no one other than the voters for their conduct in those areas. *See Beattie v. Madison County School District*, 254 F.3d at 602-03 (emphasizing that the mere existence of oversight, alone, is not enough to disqualify an official as a final policy-maker - the oversight must pertain to the area of authority in question); *Brady v. Fort Bend County*, 145 F.3d at 699-700 (holding a newly elected County Sheriff was responsible under applicable Texas for the decision not to rehire Sheriff's deputies who had campaigned for the ousted incumbent); *Turner v. Upton County*, 915 F.2d at 136 ("It has long been recognized that, in Texas, the county sheriff is the county's final policymaker in the area of law enforcement, not by virtue of delegation by the county's governing body but, rather, by virtue of the office to which the sheriff has been elected."). The focus of inquiry is on the particular task or duty performed by the official and his or her authority to exercise final control over the performance of that task or duty. Final policy-makers are usually empowered by state law to "define objectives and choose the means of achieving them" without supervision by any other governmental official. *Beattie v. Madison County School District*, 254 F.3d at 602 (holding the fact an official exercises discretion does not, standing alone, establish the official as a policymaker - the official must also create policy); *Colle v. Brazos County*, 981 F.2d at 244; *Rhode v. Denson*, 776 F.2d 107, 109 (5th Cir. 1986), *cert. denied*, 476 U.S. 1170 (1986).

For example, under Texas law, the final policy-making authority in an independent school district rests with the district's board of trustees. *Harris v. Victoria I.S.D.*, 168 F.3d at 225; *Doe v. Dallas I.S.D.*, 153 F.3d at 216; *Eugene v. Alief I.S.D.*, 65 F.3d at 1304; *Jett v. Dallas I.S.D.*, 7 F.3d

1241, 1245 (5th Cir. 1993). In contrast, the Fifth Circuit has repeatedly held that local judicial officers acting in their judicial capacities do not act as local governmental policy-makers. *See Krueger v. Reimer*, 66 F.3d 75, 77 (5th Cir. 1995) (holding neither a state district judge nor a County District Attorney acts as a local policy-maker when performing their respective official duties); *Johnson v. Moore*, 958 F.2d at 94 (holding a municipal judge's actions in repeatedly committing the plaintiff to jail without first appointing counsel for the plaintiff did not constitute actions establishing city policy); *Bigford v. Taylor*, 834 F.2d 1213, 1221-22 (5th Cir. 1988) (holding a county magistrate's ruling in a case pending before him did not constitute setting county policy), *cert. denied*, 488 U.S. 851 (1988); *Carbalan v. Vaughn*, 760 F.2d 662, 665 (5th Cir. 1985) (holding a municipal judge did not act as a county policy-maker in refusing to accept a criminal defendant's offer of credit cards charges in lieu of cash bail)), cert. denied, 474 U.S. 1077 (1985); *Familias Unidas v. Briscoe*, 619 F.2d 391, 404 (5th Cir. 1980) (holding a County Judge performing judicial duties was not a county policy-maker). Likewise, a prosecuting attorney, although acting as a local governmental official in the course of performing many administrative tasks, is a state official when instituting and prosecuting criminal proceedings. *See Mowbray v. Cameron County*, 274 F.3d at 278 (holding the County could not be held liable for failing to train prosecuting attorneys because such officials are state officers); *Brown v. Lyford*, 243 F.3d at 191-92 (holding a prosecutor pro tem appointed to prosecute a single case was not a County policy-maker when acting within the scope of his prosecutorial duties); *Esteves v. Brock*, 106 F.3d at 678 (holding an Assistant Harris County District Attorney did not serve as a local policy-maker while prosecuting a criminal case); *Krueger v. Reimer*, 66 F.3d at 77 (holding the Comal County District Attorney did not act as a local policy-maker when performing his official duties as a criminal prosecutor); *Echols v. Parker*, 909 F.2d 795,

30

801 (5th Cir. 1990) (holding a Texas district attorney is a state official when instituting criminal proceedings to enforce state law).

In addition to persons identifiable as final policy-makers under state law, the actions of officials who exercise final policy-making authority as a result of a formal delegation of that authority from a local governmental entity's governing body can also provide a basis for holding that governmental entity liable under Section 1983. *Pembaur v. City of Cincinnati*, 475 U.S. at 483, 106 S. Ct. at 1300 (*plurality*); *Doe v. Dallas I.S.D.*, 153 F.3d at 216 (holding a local school district did not delegate final District policymaking authority over complaints of sexual misconduct by teachers against students to campus principals although the District had not adopted a formal policy addressing the manner in which such complaints should be handled); *Matthias v. Bingley*, 906 F.2d at 1054 (holding a city liable for the illegal actions of a city police chief in connection with the disposition of seized private property where the city had delegated responsibility for the property to the chief); *Crowder v. Sinyard*, 884 F.2d 804, 829 (5th Cir. 1989) (holding a jury's finding that a city had delegated its final policy-making authority in the area of law enforcement to a city police chief was supported by the evidence and warranted imposing liability upon the city), *cert. denied*, 496 U.S. 924 (5th Cir. 1990).  Only the actions of, or policies established by, those local governmental officials who exercise independent, final, decision-making authority can create a basis for holding a local governmental entity liable under Section 1983. *See Eugene v. Alief I.S.D.*, 65 F.3d at 1304-05 (holding a school district could not be held liable based on a school principal's directive to have a parent arrested, despite evidence showing the delegation of considerable authority to the principal because there was no showing the principal had been delegated policy-making authority over school security); *Sanders v. English*, 950 F.2d 1152, 1159 n.13 (5th Cir. 1992) (holding a city may be held

31

liable on account of the unconstitutional conduct of city officials only if the city's policy or custom played a part in the violation); *Burns v. City of Galveston*, 905 F.2d 100, 102-03 (5th Cir. 1990) (holding Section 1983 liability for a city can only be based on a deliberate choice to follow a course of action made by final policy-makers); *Worsham v. City of Pasadena*, 881 F.2d 1336, 1240-41 (5th Cir. 1989) (holding the existence of a council with the authority to review and set aside a city mayor's decision to terminate a municipal employee, which it did, precluded a finding that the mayor possessed final city policy-making authority over the employee's termination and, therefore, also precluded a finding of municipal liability resulting from the mayor's subsequently-vacated action). Plaintiff has alleged no specific facts showing any person to whom Bexar County has delegated official policymaking authority had any personal involvement in, or personal knowledge of, any of the events giving rise to plaintiff's claims in this Section 1983 action.

Furthermore, where the act or omission of the final policy-maker personally did not directly cause the violation of a constitutional right, only decisions of the final municipal policy-maker which constitute a conscious disregard for a high risk of unconstitutional conduct by others can give rise to municipal liability. *Board of Commissioners, Bryan County, Oklahoma v. Brown*, 520 U.S. at 404-06, 117 S. Ct. at 1388-89; *Doe v. Dallas I.S.D.*, 153 F.3d at 216-17.

> A municipality is liable under § 1983 "only where the municipality itself causes the constitutional violation at issue." The violation must be caused by a "municipal policy or custom" consisting of a "'deliberate' or 'conscious' choice "by city policymakers." This Court has stated that a municipal policy may be established by a persistent pattern of conduct as well as by a formal legal declaration.

*Richardson v. Oldham*, 12 F.3d 1373, 1381-82 (5th Cir. 1994).

The Fifth Circuit has long made clear a Section 1983 plaintiff must establish a causal connection between an alleged violation of the plaintiff's constitutional rights and the municipality's policies or customs. *See, e.g., Bishop v. Arcuri*, 674 F.3d at 467 ("A municipality is liable only when its policy is the 'moving force' behind the suffered injury, but when a municipal policy itself violates federal law, such a policy necessarily constitutes the 'moving force.'" (*citation omitted*)); *Spiller v. City of Texas City, Police Department*, 130 F.3d at 167 (holding that, to satisfy the cause in fact requirement, a plaintiff must allege the custom or policy served as the moving force behind the constitutional violation or that the injuries resulted from the execution of the official policy or custom; but emphasizing that the relationship between the underlying constitutional violation and the policy or custom must be based upon specific facts not mere conclusions). Plaintiff has alleged no facts suggesting a causal link exists between any alleged injury or violation of his constitutional rights he has suffered and either (1) an official policy attributable to final County policymakers or (2) a widespread pattern or longstanding custom of misconduct on the part of Bexar County's non-policymaking employees.

Municipal liability under Section 1983 attaches only when the official responsible for establishing final policy with respect to the subject matter in question, makes a deliberate choice to follow a course of action from among various alternatives. *Board of Commissioners, Bryan County, Oklahoma v. Brown*, 520 U.S. at 404-05, 117 S. Ct. at 1388-89; *City of St. Louis v. Praprotnik*, 485 U.S. at 121-22, 108 S. Ct. at 923; *Pembaur v. City of Cincinnati*, 475 U.S. at 483-84, 106 S. Ct. at 1299-1300 (*plurality*); *Rhyne v. Henderson County*, 973 F.2d at 392. Thus, mere negligence on the part of local governmental final policy-makers does not give rise to governmental liability under Section 1983. *Daniels v. Williams*, 474 U.S. 326, 331-34, 106 S. Ct. 662, 664-67, 88 L. Ed. 2d 662

(1986); *Davidson v. Cannon*, 474 U.S. 344, 347-48, 106 S. Ct. 668, 670-71, 88 L. Ed. 2d 677 (1986); *Doe v. Dallas I.S.D.*, 153 F.3d at 215-17 (holding school district's failure to adopt an official policy addressing allegations of sexual assault by teachers on students could not support Section 1983 liability where that failure was merely an unintentional negligent oversight); *Campbell v. City of San Antonio*, 43 F.3d 973, 977 (5th Cir. 1995).

A municipality may be held liable under Section 1983 for failing to adopt a policy when that failure rises to the level of "deliberate indifference" to the need for such a policy. *City of Canton v. Harris*, 489 U.S. 378, 389, 109 S. Ct. 1197, 1205, 103 L. Ed. 2d 412 (1989); *Colle v. Brazos County*, 981 F.2d at 245-46; *Rhyne v. Henderson County*, 973 F.2d at 392; *Benavides v. County of Wilson*, 955 F.2d at 972-73. Under this test, a governmental entity can be held liable if in the light of the duties assigned to specific officers or employees, the need for such a policy is so obvious, and the absence of such a policy so likely to result in violations of constitutional rights, that the governmental entity's policy-makers can reasonably be said to have been "deliberately indifferent" to the need for the policy. *City of Canton v. Harris*, 489 U.S. at 389, 109 S. Ct. at 1205. Mere negligence by policy-makers in the face of unconstitutional behavior by municipal employees is insufficient to establish municipal liability under Section 1983. *Collins v. City of Harker Heights, Texas*, 916 F.2d at 286; *Doe v. Dallas I.S.D.*, 153 F.3d at 217. Furthermore, the municipality must be the moving force behind the resulting constitutional violation. *Board of Commissioners of Bryan County v. Brown*, 520 U.S. at 415, 117 S. Ct. at 1394; *Doe v. Dallas I.S.D.*, 153 F.3d at 215-16.

Plaintiff has alleged no specific facts showing Bexar County's official policymakers ever displayed deliberate indifference to either a widespread pattern of misconduct by Bexar County employees or a longstanding custom of misconduct by Bexar County employees with regard to the

34

treatment of persons detained prior to trial at the University Hospital's controlled access unit, at the

BCADC, or at any other facility where Bexar County holds pretrial detainees.  Plaintiff does not

allege that Bexar County employees have ever (1) intentionally inflicted emotional distress, (2)

physically assaulted, or (3) denied adequate medical care to any pretrial detainee other than himself.

E.    Lack of Official Policy or Personal Involvement by Final County Policymakers

> "To establish municipal liability under § 1983, a plaintiff must show that (1)
> an official policy (2) promulgated by the municipal policymaker (3) was the moving
> force behind the violation of a constitutional right." *Peterson v. City of Fort Worth,
> Tex.,* 588 F.3d 838, 847 (5th Cir.2009).  The proposed amended complaint makes no
> specific factual allegations of the county's policies and simply adds the words
> "policies, practices, and/or customs" to Whitley's perceived wrongs.  Such allegations
> are insufficient to survive dismissal. *See Spiller v. City of Tex. City, Police Dep't,* 130
> F.3d 162, 167 (5th Cir.1997) (conclusory description of policy or custom
> insufficient).

*Whitley v. Hanna,* 726 F.3d 631, 649 (5th Cir. 2013), *cert. denied,* 134 S. Ct. 1935 (2014).

> "Knowledge on the part of a policymaker that a constitutional violation will
> most likely result from a[n] ... official custom or policy is a *sine qua non* of
> municipal liability under section 1983." *Burge v. St. Tammany Parish,* 336 F.3d 363,
> 370 (5th Cir.2003) (footnote omitted).  Accordingly, a plaintiff must establish that
> the body governing a municipality, or an official to whom the body had delegated its
> policy-making authority, had actual or constructive knowledge of the custom or
> policy at issue. *Id.* (citation omitted).

*Curtis v. Anthony,* 710 F.3d 587, 595 (5th Cir. 2013).

> A claim of municipal liability under Section 1983 "requires proof of three
> elements: a policymaker; an official policy; and a violation of constitutional rights
> whose 'moving force' is the policy or custom." *Piotrowski,* 237 F.3d at 578 (citing
> *Monell,* 436 U.S. at 694, 98 S. Ct. 2018). We have stated time and again that
> "[w]ithout an underlying constitutional violation, an essential element of municipal
> liability is missing." *Becerra v. Asher,* 105 F.3d 1042, 1048 (5th Cir.1997); *see also
> Collins v. City of Harker Heights, Tex.,* 503 U.S. 115, 120, 112 S. Ct. 1061, 117 L.
> Ed. 2d 261 (1992) "[P]roper analysis requires us to separate two different issues

when a § 1983 claim is asserted against a municipality: (1) whether plaintiff's harm was caused by a constitutional violation, and (2) if so, whether the city is responsible for that violation.").

*Doe ex rel. Magee v. Covington County School Dist. ex rel. Keys*, 675 F.3d 849, 866-67 (5th Cir. 2012).

As explained above, plaintiff has failed to allege any specific facts showing that any final Bexar County policymaker or policymakers ever adopted as official policy or implicitly approved any longstanding custom or widespread practice by non-policymaking County employees of either (1) intentionally inflicting emotional distress upon, (2) physically assaulting, or (3) denying adequate medical care to pretrial detainees in violation of the constitutional rights of those pretrial detainees. As such, plaintiff has failed to allege any specific facts showing defendant Bexar County is legally responsible for any alleged violation of plaintiff's federal constitutional rights identified in plaintiff's pro se pleadings in this Section 1983 lawsuit.

F.      Failure to Train

Plaintiff alleges in a conclusory manner that unidentified Bexar County officials failed to properly train or supervise defendant Garcia and other Bexar County employees employed at the University Hospital's controlled access unit and at the BCADC with regard to (1) the use of force, including the use of physical restraints, which may be employed against pretrial detainees held in those facilities, (2) the intentional infliction of emotional distress upon pretrial detainees, and (3) the provision of adequate medical care to pretrial detainees.

To succeed on a complaint against a municipality based upon an allegation that non-policymaking employees were inadequately trained, a Section 1983 plaintiff must show (1) the

36

municipality's training procedures were inadequate, (2) the municipality's policymaker was deliberately indifferent in adopting the training policy, and (3) the inadequate training policy directly caused the plaintiff's injury. *Whitley v. Hanna*, 726 F.3d at 648-49; *Carnaby v. City of Houston*, 636 F.3d 183, 189 (5th Cir. 2011); *Zarnow v. City of Wichita Fallas, Texas*, 614 F.3d 161, 170 (5th Cir. 2010), *cert. denied*, 131 S. Ct. 3069 (2011); *Valle v. City of Houston*, 613 F.3d 536, 544, 546 (5th Cir. 2010), *cert. denied*, 131 S. Ct. 2094 (2011); *Sanders-Burns v. City of Plano*, 594 F.3d at 381. The Fifth Circuit has rarely found municipal liability for a failure to train claim on the basis of a single incident. *Valle v. City of Houston*, 613 F.3d at 549 ("This court has been wary of finding municipal liability on the basis of a single incident to avoid running afoul of the Supreme Court's consistent rejection of respondeat superior liability."); *Sanders-Burns v. City of Plano*, 594 F.3d at 381 ("a showing of deliberate indifference is difficult, although not impossible, to base upon a single incident"); *Pineda v. City of Houston*, 291 F.3d 325, 334-35 (5th Cir. 2002), *cert. denied sub nom. Navarro Pineda v. City of Houston*, 537 U.S. 1110 (2003).

Plaintiff has not alleged any specific facts which either (1) identify any specific defect or inadequacy in Bexar County's training program for its deputy sheriffs, (2) establish Bexar County's final policymaker or policymakers were deliberately indifferent in adopting the allegedly inadequate training policy, or (3) the allegedly inadequate training policy directly caused any injury to plaintiff. On the contrary, plaintiff's pleadings throughout this lawsuit repeatedly assert that defendant Garcia and other deputy sheriffs and BCADC personnel acted in a manner *inconsistent* with established Bexar County policies and procedures for the treatment of pretrial detainees. Plaintiff has alleged no specific facts showing that final Bexar County policymakers were ever made aware or had constructive knowledge (due to a longstanding custom or widespread practice of unconstitutional

misbehavior by the County's non-policymaking employees) of any defect or inadequacy in the County's training programs for its deputy sheriffs or BCADC employees. Under such circumstances, plaintiff's conclusory failure-to-train assertions fail to state a cause of action under Section 1983 against Bexar County.

## G. Conclusions Regarding Plaintiff's Claims Against Bexar County

Plaintiff has named as a defendant one individual whom plaintiff alleges was employed by Bexar County at the time of the events giving rise to plaintiff's claims herein, i.e., defendant Garcia. Plaintiff also mentions several other persons in his pleadings whom he identifies as Bexar County employees, including deputies Fikes, Ochoa, Leal, and "E. Garcia." Plaintiff also alleges in conclusory fashion that other Bexar County employees not identified by name failed to furnish plaintiff with adequate medical care. As explained above, however, plaintiff does not allege, however, any specific facts showing defendant Garcia or any of these other individuals have ever exercised final policymaking authority on behalf of Bexar County, Texas. Nor does plaintiff allege any specific facts showing that plaintiff suffered any injury or violation of his federal constitutional rights *as a result* of any official policy, widespread practice, or long-standing custom attributable to final Bexar County policymakers. Insofar as plaintiff alleges in conclusory fashion that Bexar County failed to properly train defendant Garcia or other County employees and, as a result, plaintiff suffered an injury from either (1) defendant Garcia's alleged intentional infliction of emotional distress upon plaintiff, (2) defendant Garcia's alleged use of excessive force against plaintiff, or (3) the alleged denial of adequate medical care to plaintiff by any of the individual defendants or any other employee of Bexar County, plaintiff has wholly failed to identify (1) any specific defect in the County's training policies or procedures for its deputy Sheriffs or other employees, (2) any facts

38

showing final County policymakers ever official adopted or implicitly approved the allegedly inadequate training program, or (3) plaintiff's federal constitutional rights were violated as a result of the identified deficiency or inadequacy in the County's training program for its non-policymaking employees.  Under such circumstances, plaintiff has failed to allege a cause of action under Section 1983 against defendant Bexar County.  *See Kitchen v. Dallas County, Texas,*  759 F.3d 468, 484 (5th Cir. 2014) (holding municipal liability for failure to train applies only in two situations: (1) where a municipality has notice of a pattern of similar violations which were fairly similar to what ultimately transpired when the plaintiff's constitutional rights were violated and (2) a narrow range of circumstances where a constitutional violation would result as "the highly predictable consequence" of a particular failure to train).  Plaintiff has not only failed to identify any particular defect in the County's training program for its Deputies sufficient to satisfy the second option; plaintiff has also failed to identify any other similar, prior, incidents which could have put the County's policymakers on notice of a defect in the County's training program.

Plaintiff was advised, at least as early as the Magistrate Judge's initial Show Cause Order issued October 2, 2014 (ECF no. 4), of the defects in plaintiff's original complaint regarding his claims against Bexar County.  Plaintiff has had ample opportunity to amend and supplement his pleadings and has done so repeatedly (*see, e.g.,* ECF nos. 7, 9, 17, 18, 19, 20, 22).  Plaintiff has likewise responded to defendant Bexar County's motion to dismiss (ECF no. 105).  For the reasons discussed at length above, the County's motion to dismiss under Rule 12(b)(6) will be granted and plaintiff's federal civil rights claims against the County will be dismissed without prejudice.  *See Moawad v. Childs,* 673 F.2d 850, 851 (5th Cir. 1982) (dismissal of a pro se complaint for failure to state a claim under Rule 12(b)(6) should be without prejudice).

## V. <u>The Nature of Summary Judgment Procedure and Proof in the Federal Courts</u>

Rule 56(f), Federal Rules of Civil Procedure, permits a federal district court to consider

summary judgment on its own after identifying for the parties material facts that may not be

genuinely in dispute and giving notice and time for the parties to respond. *Breton Energy, L.L.C.*

*v. Mariner Energy Resources, Incorporated*, 764 F.3d 394, 400 n.21 (5th Cir. 2014); *Atkins v.*

*Salazar*, 677 F.3d 667, 678 (5th Cir. 2011) ("'[D]istrict courts are widely acknowledged to possess

the power to enter summary judgments *sua sponte,* so long as the losing party was on notice that she

had to come forward with all of her evidence.' *Celotex Corp. v. Catrett,* 477 U.S. 317, 326, 106 S.Ct.

2548, 91 L.Ed.2d 265 (1986)."). The Magistrate Judge's Orders of August 14, 2015 furnished the

parties with such notice and a reasonable opportunity to conduct discovery and furnish this Court

with proper summary judgment evidence.

> Summary judgment is appropriate "if the movant shows that there is no genuine
> dispute as to any material fact and the movant is entitled to judgment as a matter of
> law." Fed.R.Civ.P. 56(a). A genuine dispute of material fact exists when the
> "evidence is such that a reasonable jury could return a verdict for the nonmoving
> party." *Royal v. CCC & R Tres Arboles, L.L.C.,* 736 F.3d 396, 400 (5th Cir.2013)
> (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).

*Wilcox v. Wild Well Control, Inc.*, 794 F.3d 531, 535-36 (5th Cir. 2015).

Summary Judgment is appropriate if the pleadings, depositions, answers to interrogatories,

and admissions on file, together with affidavits, if any, show there is no genuine issue as to any

material fact and that the moving party is entitled to a judgment as a matter of law:

> The moving party " 'bears the initial responsibility of informing the district court of
> the basis for its motion, and identifying those portions of [the record] which it
> believes demonstrate the absence of a genuine issue of material fact.' " *E.E.O.C. v.*
> *LHC Grp., Inc.,* 773 F.3d 688, 694 (5th Cir.2014) (alteration in original) (quoting

*Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Once the moving party fulfills this responsibility, the non-moving party must "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* (quoting *Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. 2548) (internal quotation marks omitted). Where the non-movant bears the burden of proof at trial, "the movant may merely point to the absence of evidence and thereby shift to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial." *Transamerica Ins. Co. v. Avenell,* 66 F.3d 715, 718–19 (5th Cir.1995) (per curiam).

*Nola Spice Designs, L.L.C. v. Haydel Enterprises, Inc.,* 783 F.3d 527, 536 (5th Cir. 2015).

Federal summary judgment procedure requires the court to "pierce through the pleadings and their adroit craftsmanship to reach the substance of the claim." *Tacon Mechanical Contractors v. Aetna Casualty and Surety Company,* 65 F.3d 486, 488 (5th Cir. 1995). The court must review all of the evidence in the record but make no credibility determination nor weigh any evidence; the court must disregard all evidence favorable to the moving party that the jury is not required to believe and should give credence to the evidence favoring the nonmoving party as well as the evidence supporting the moving party that is uncontradicted and un-impeached. *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 150-51, 120 S.Ct. 2097, 22110, 147 L.Ed.2d 105 (2000); *Peel & Company v. The Rug Market,* 238 F.3d 391, 394 (5th Cir. 2001).

In the usual case, the party who seeks summary judgment must show by affidavit or other evidentiary materials that there is no genuine dispute as to any fact material to resolution of the motion. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 n.4, 106 S. Ct. 2505, 2511 n.2, 91 L. Ed. 2d 265 (1986);   While the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, he need not negate the essential elements of the non-movant's case.

*Wallace v. Texas Tech University*, 80 F.3d 1042, 1047 (5th Cir. 1996); *Little v. Liquid Air Corporation*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citing *Celotex Corp. v. Catrett*, 477 U.S. at 323, 106 S.Ct. at 2553).  In order for the Court to find there are no genuine material factual issues, the Court must be satisfied that no reasonable trier of fact could have found for the nonmoving party or, in other words, that the evidence favoring the nonmoving party is insufficient to enable a reasonable jury to return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 249-50, 106 S. Ct. at 2510-11; *Matsushita Electrical Industrial Co., Ltd. v. Zenith Radio Corporation*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986).  To satisfy this burden, the movant must either submit evidentiary documents that negate the existence of some material element of the nonmoving party's claim or defense or, if the crucial issue is one for which the nonmoving party will bear the burden of proof at trial, merely point out that the evidentiary documents in the record contain insufficient proof concerning an essential element of the nonmoving partys claim or defense. *Celotex Corp. v. Catrett*, 477 U.S. at 325, 106 S. Ct. at 2552; *Mississippi River Basin Alliance v. Westphal*, 230 F.3d 170, 174 (5th Cir. 2000).

A summary judgment movant who will not bear the burden of proof at trial may meet its initial burden of establishing that there is no genuine issue of material fact merely by pointing out the absence of evidence supporting the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. at 323-24, 106 S.Ct. at 2553.  Such is the case with regard to defendants Garcia and Summerville. These defendants have each raised the defense of qualified immunity.  Plaintiff bears the burden of presenting proper summary judgment evidence showing there is a genuine issue of material fact with regard to whether plaintiff can overcome the defense of qualified immunity.

42

"Once a properly supported motion for summary judgment is presented, the burden shifts to the non-moving party to set forth specifically facts showing that there is a genuine issue for trial." *Seatrax, Inc. v. Sonbeck Intern., Inc.*, 200 F.3d 358, 363-64 (5th Cir. 2000) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 249, 106 S. Ct. at 2510–11). The nonmoving party cannot discharge this burden by referring to the mere allegations or denials of the nonmoving party's pleadings; rather, that party must, either by submitting opposing evidentiary documents or by referring to evidentiary documents already in the record, set out specific facts showing that a genuine issue as to a material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. at 324, 106 S. Ct. at 2553. The party opposing a motion supported by evidence cannot discharge his burden by alleging mere legal conclusions; instead, he must present affirmative evidence in order to defeat a properly supported motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248-55, 106 S. Ct. at 2510-14; *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. at 586, 106 S. Ct. at 1355-56. "Conclusional allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation do not adequately substitute for specific facts showing a genuine issue for trial." *Pioneer Exploration, L.L.C. v. Steadfast Ins. Co.*, 767 F.3d 503, 511 (5th Cir. 2014); *Oliver v. Scott*, 276 F.3d 736, 744 (5th Cir. 2002); *See also Jenkins v. City of San Antonio Fire Dept.*, 784 F.3d 263, 267 (5th Cir. 2015) ("'[s]ummary judgment may not be thwarted by conclusional allegations, unsupported assertions, or presentation of only a scintilla of evidence.'" (quoting *McFaul v. Valenzuela*, 684 F.3d 564, 571 (5th Cir. 2012)). The non-movant must identify with specificity where in the record the evidence exists which that party claims raises a genuine issue of material fact precluding summary judgment:

When evidence exists in the summary judgment record but the nonmovant fails even to refer to it in the response to the motion for summary judgment, that evidence is not properly before the district court. *See Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir.1998); *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 916 (5th Cir.1992), *cert. denied*, 506 U.S. 832, 113 S.Ct. 98, 121 L.Ed.2d 59 (1992). "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Ragas*, 136 F.3d at 458; *Stults*, 76 F.3d at 657; *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir.1994), *cert. denied*, 513 U.S. 871, 115 S.Ct. 195, 130 L.Ed.2d 127 (1994); *Skotak*, 953 F.2d at 916 n. 7; *see also Nissho–Iwai American Corp. v. Kline*, 845 F.2d 1300, 1307 (5th Cir.1988) (it is not necessary "that the entire record in the case ... be searched and found bereft of a genuine issue of material fact before summary judgment may be properly entered"); *cf. U.S. v. Dunkel*, 927 F.2d 955, 956 (7th Cir.1991) ("Judges are not like pigs, hunting for truffles buried in briefs."). Because Rincones did not identify any evidence of damages in his summary judgment response, the evidence was not properly before the district court and will not be considered here.

*Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003).

If he is unable to present affirmative evidence with his response to the motion, the nonmoving party must explain the reasons for his inability.  *See Access Telecom, Inc. v. MCT Telecommunications Corporation*, 197 F.3d 694, 719 (5th Cir. 1999) ("To obtain a continuance of a motion for summary judgment, a party must 'specifically explain both why it is currently unable to present evidence creating a genuine issue of fact and how a continuance would enable the party to present such evidence.'" (citing *Liquid Drill, Inc. v. U.S. Turnkey Exploration, Inc.*, 48 F.3d 927, 930 (5th Cir. 1995)), *cert. denied*, 531 U.S. 917 (2000) ; *Reese v. Anderson*, 926 F.2d 494, 499 & n.5 (holding general allegations of a need for additional discovery will not suffice; the person presenting such a claim must show what discovery has been obtained, why it is inadequate, and the what additional information he expects to obtain from additional discovery).

All of the evidence and inferences drawn from that evidence must be viewed in the light most favorable to the party opposing the motion for summary judgment. *Spong v. Fidelity Nat. Property*

*and Cas. Ins. Co.*, 787 F.3d 296, 298 (5th Cir. 2015); *Gil Ramirez Group, L.L.C. v. Houston*

*Independent School District*, 786 F.3d 400, 408 (5th Cir. 2015).  However, there must be admissible

evidence in the record giving rise to reasonable inferences that support the non-moving party's

position:

> Federal Rule of Civil Procedure 56(c)(4) provides that an affidavit "used to support
> or oppose a motion" for summary judgment "must be made on personal knowledge."
> We have repeatedly held that an affidavit does not meet this requirement simply
> because the affiant states that her conclusions are based on personal knowledge.
> Rather, the affiant must provide the district court with sufficient information to allow
> the latter to conclude that the affiant's assertions are indeed based on such
> knowledge.

*Meadaa v. K.A.P. Enterprises, L.L.C.*, 756 F.3d 875, 881 (5th Cir. 2014) (Footnote and citation
omitted).

> Rule 56(d) provides as follows:

>> If a nonmovant shows by affidavit or declaration that, for specified
>> reasons, it cannot present facts essential to justify its opposition, the
>> court may: (1) defer considering the motion or deny it; (2) allow time
>> to obtain affidavits or declarations or to take discovery; or (3) issue
>> any other appropriate order.

Rule 56(d) motions are "broadly favored and should be liberally granted." *Raby v. Livingston*,

600 F.3d 552, 561 (5th Cir.2010).  The Rule 56(d) movant "must set forth a plausible basis for

believing that specified facts, susceptible of collection within a reasonable time frame, probably exist

and indicate how the emergent facts, if adduced, will influence the outcome of the pending summary

judgment motion." *Id.* (quoting *C.B. Trucking, Inc. v. Waste Mgmt. Inc.*, 137 F.3d 41, 44 (1st

Cir.1998)). If the requesting party "has not diligently pursued discovery, however, she is not entitled

to relief" under Rule 56(d). *Beattie v. Madison Cnty. Sch. Dist.*, 254 F.3d 595, 606 (5th Cir.2001).

Although *pro se* litigants are not held to the same standards of compliance with formal or technical pleading rules applied to attorneys, the Fifth Circuit Court of Appeals has never allowed pro se litigants, or any other type of litigants, to oppose summary judgments by the use of unsworn materials. *See, e.g., Provident Life and Acc. Ins. Co. v. Goel*, 274 F.3d 984, 1000 (5th Cir. 2001) (holding district court properly disregarded unsworn expert report); *Watts v. Kroger Company*, 170 F.3d 505, 508 (5th Cir. 1999) (holding a district court properly struck several handwritten, unsworn, not notarized statements that were not in the form of affidavits); *King v. Dogan*, 31 F.3d 344, 346 (5th Cir. 1994) (refusing to permit a *pro se* litigant to rely upon an unverified pleading and unauthenticated documents to defeat the defendant's motion for summary judgment). In order for verified or sworn pleadings to constitute proper summary judgment proof, they must conform to the requirements of affidavits, i.e, they must establish the affiant's competency to testify to the matters in question, be based upon personal knowledge, and contain a clear explication of factual information that would be admissible at trial, not mere unsupported conclusions. *See Sanchez v. Carrollton-Farmers Branch Independent School District*, 647 F.3d 156, 165 (5th Cir. 2011) ("Conclusional allegations and denials, speculation, and unsupported assertions are insufficient to avoid summary judgment."); *Thompson v. Goetzmann*, 337 F.3d 489, 503 (5th Cir. 2003) ("The nonmoving party, however, cannot satisfy his summary judgment burden with conclusional allegations, unsubstantiated assertions, or only a scintilla of evidence."); *Marshall v. East Carroll Parish Hospital*, 134 F.3d 319, 324-25 (5th Cir. 1998) (holding conclusory, unsupported, statements in an affidavit insufficient to create a genuine issue of material fact); *Barhan v. Ry-Ron Inc.*, 121 F.3d 198, 202 (5th Cir. 1997) (holding hearsay in an affidavit does not constitute proper summary judgment evidence); *Clark v. America's Favorite Chicken Co.*, 110 F.3d 295, 297 (5th Cir. 1997)

46

(holding unsupported allegations or affidavit or deposition testimony setting forth ultimate or conclusory facts and conclusions of law are insufficient to defeat a motion for summary judgment); *King v. Dogan*, 31 F.3d at 346 (holding a verified complaint may be considered as summary judgment evidence only to the extent that it comports with the requirements of former Rule 56(e) (now codified as Rule 56(c)(4)); *Cormier v. Pennzoil*, 969 F.2d 1559, 1561 (5th Cir. 1992) (holding a court may not consider hearsay contained in an affidavit when ruling on a summary judgment motion); *Orthopedic & Sports Injury Clinic v. Wang*, 922 F.2d 220, 225 (5th Cir. 1991) (holding unsupported affidavits setting forth ultimate or conclusory facts and conclusions of law are insufficient to either support or defeat a motion for summary judgment). To constitute proper summary judgment evidence, assertions in affidavits must be based upon the affiant's own personal knowledge. *See Celtic Marine Corp. v. James C. Justice Companies, Incorporated*, 760 F.3d 477, 482-83 (5th Cir. 2014) (holding self-serving statements contained in an affidavit which were not based on the affiant's personal knowledge did not constitute proper summary judgment evidence); Rule 56(c)(4), Fed.R.Civ.P. Defendants Garcia, Summerville, and the Bexar County Hospital District d/b/a University Health System have all filed motions for summary judgment. Plaintiff has had more than adequate opportunity to respond thereto.

## VI. Qualified Immunity

Defendants Garcia and Summerville, as public employees, are entitled to assert the defense of qualified immunity.[8] The same is true for the two nurse's aides named as defendants and

---

[8] Defendant Garcia's affidavit, attached to defendant Garcia's motion to dismiss, filed June 18, 2015 (ECF no. 38), identifies this defendant as a Bexar County Sheriff's Deputy. While plaintiff has challenged many other assertions made by this defendant, plaintiff does not furnish any proper summary judgment evidence contradicting this assertion by defendant Garcia. The

incompletely identified by plaintiff in his pleadings herein; plaintiff identifies each of these nurse's aides as employees of University Health System. Even when a state official or other person acting under color of state law engages in constitutionally impermissible conduct, the defendant may nevertheless be shielded from liability for civil damages if the defendant's actions did not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Hope v. Pelzer*, 536 U.S. 730, 739, 122 S. Ct. 2508, 2515, 153 L. Ed. 2d 666 (2002). "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions." *Ashcroft v. al–Kidd,* 563 U.S. 731, ___, 131 S. Ct. 2074, 2085, 179 L. Ed. 2d 1149 (2011); *McCreary v. Richardson*, 738 F.3d 651, 655 (5th Cir. 2013).

The defense of qualified immunity first recognized in *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982), is neither a complete barrier to recovery nor a true affirmative defense. Rather, its invocation serves to shift the burdens of pleading and proof in federal civil rights lawsuits brought against public officials for actions or omissions attending their performance of official duties. A party seeking damages from an official asserting <u>Harlow</u> qualified immunity bears the burden of overcoming that defense. *McCreary v. Richardson*, 738 F.3d at 655; *Wyatt v. Fletcher*, 718 F.3d 496, 802 (5th Cir. 2013); *Crostley v. Lamar County, Texas*, 717 F.3d 410, 422 (5th Cir. 2013). Once a government official or employee has asserted qualified immunity and established that the allegedly wrongful acts were undertaken within the scope of his discretionary

---

same is true for the assertion by defendant Summerville in her affidavit, attached to defendant Summerville's notice of filing summary judgment evidence, filed September 3, 2015 (ECF no. 69), that is a nurse employed at the University Hospital who provided post-surgical patient care to plaintiff on September 23-25, 2012. As such, it is uncontroverted that both these defendants were public employees performing discretionary tasks at all times relevant to plaintiff's claims herein.

authority, the burden shifts to the party seeking damages to show that qualified immunity does *not*

bar recovery. The Fifth Circuit has authorized the dismissal as frivolous of civil rights claims which

fail to establish a violation of the plaintiff's "clearly established" federal rights. *See Moore v.*

*Carwell*, 168 F.3d 234, 236-37 (5th Cir. 1999) (affirming summary dismissal of complaint against

state prison officials as frivolous on qualified immunity grounds).   An official acts within his

discretionary authority when he performs non-ministerial acts within the boundaries of his official

capacity. *Tamez v. City of San Marcos, Texas*, 118 F.3d 1085, 1091-92 (5th Cir. 1997), *cert. denied*,

522 U.S. 1125 (1998); *see also Goodman v. Harris County*, 571 F.3d 388, 395 (5th Cir. 2009)

(qualified immunity shields government officials acting within their discretionary authority from

liability when their conduct does not violate clearly established statutory or constitutional law of

which a reasonable person would have known), *cert. denied sub nom. Ashabranner v. Goodman*, 558

U.S. 1148 (2010); *Gates v. Texas Department of Protective and Regulatory Services*, 537 F.3d 404,

418 (5th Cir. 2008) (holding the same); *Waltman v. Payne*, 535 F.3d 342, 346 (5th Cir. 2008)

(holding the same).

An official acts within the scope of his authority if he discharges the duties generally assigned

to him. *Tamez v. City of San Marcos, Texas*, 118 F.3d at 1091-92. For executive officers in general,

qualified immunity is the norm. *Malley v. Briggs*, 475 U.S. 335, 340, 106 S. Ct. 1092, 1095, 89 L.

Ed. 2d 271 (1986); *Harlow v. Fitzgerald*, 457 U.S. at 807, 102 S. Ct. at 2732.

> [Q]ualified immunity operates "to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful." *Saucier v. Katz,* 533 U.S., at 206, 121 S. Ct. 2151. For a constitutional right to be clearly established, its contours "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, see Mitchell [v. *Forsyth,* 472 U.S. 511,] 535, n. 12, 105 S. Ct. 2806, 86 L.

49

Ed. 2d 411; but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987).

Officers sued in a civil action for damages under 42 U.S.C. § 1983 have the same right to fair notice as do defendants charged with the criminal offense defined in 18 U.S.C. § 242. Section 242 makes it a crime for a state official to act "willfully" and under color of law to deprive a person of rights protected by the Constitution. In *United States v. Lanier,* 520 U.S. 259, 117 S. Ct. 1219, 137 L. Ed. 2d 432 (1997), we held that the defendant was entitled to "fair warning" that his conduct deprived his victim of a constitutional right, and that the standard for determining the adequacy of that warning was the same as the standard for determining whether a constitutional right was "clearly established" in civil litigation under § 1983.

*Hope v. Pelzer,* 536 U.S. at 739-40, 122 S. Ct. at 2515.

The Supreme Court has admonished district courts that the *Harlow* qualified immunity is an immunity *from suit* rather than a mere defense to liability. *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S. Ct. 2806, 2815, 86 L. Ed. 2d 411 (1985). The Supreme Court and the Fifth Circuit have also strongly encouraged district courts to dispose of §1983 lawsuits in which qualified immunity claims are apparent from the pleadings without resort to cumbersome and expensive discovery. *See Siegert v. Gilley,* 500 U.S. 226, 231-302, 111 S. Ct. 1789, 1793, 114 L. Ed. 2d 277 (1991) (holding that, until a determination is made that the plaintiff's clearly established constitutional rights were violated, discovery should not be allowed); *Anderson v. Creighton,* 483 U.S. 635, 646 n.6, 107 S. Ct. 3034, 3042 n.6, 97 L. Ed. 2d 523 (1987) (recognizing one of the purposes of qualified immunity is to protect public officials from the broad-ranging discovery that can be peculiarly disruptive of effective government); *Mitchell v. Forsyth,* 472 U.S. at 526-27, 105 S. Ct. at 2815-16 (holding denials of qualified immunity are subject to immediate appellate review because the protection afforded by qualified immunity is one from suit, not just liability); *Harlow v. Fitzgerald,* 457 U.S. at 818, 102 S. Ct. at 2738 ("If the law at that time was not clearly established, an official could not

reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to 'know' that the law forbade conduct not previously identified as unlawful. Until this threshold immunity question is resolved, discovery should not be allowed.").

Once a defendant pleads qualified immunity, the judge must first determine whether the plaintiff has asserted a violation of a constitutional right, then whether the defendant's actions were objectively reasonable in light of the law that was clearly established at the time the contested action occurred; until this threshold is resolved, discovery should not be allowed. *Siegert v. Gilley*, 500 U.S. at 232-33, 111 S. Ct. at 1793; *Harlow v. Fitzgerald*, 457 U.S. at 818, 102 S. Ct. at 2738. Currently applicable constitutional standards are used in making the determination as to whether the defendant's conduct violated a plaintiff's "clearly established" constitutionally-protected right. *Siegert v. Gilley*, 500 U.S. at 231, 111 S. Ct. at 1793; *Easter v. Powell*, 467 F.3d 459, 462 (5th Cir. 2006). If the plaintiff passes this threshold, the Court must determine whether the defendant's conduct was "objectively reasonable" under legal principles as they existed at the time of the defendant's acts or omissions. *See Wyatt v. Fletcher*, 718 F.3d 496, 502 (5th Cir. 2013) (a right is clearly established only if its contours are sufficiently cleat that a reasonable official would understand that what he is doing violates that right); *Easter v. Powell*, 467 F.3d at 462 ("First, we determine whether, under current constitutional standards, the plaintiff has alleged a violation of a clearly established constitutional right. If so, we then decide if the defendant's conduct was objectively reasonable in light of the clearly established law at the time of the incident." (Footnote omitted)); *Spann v. Rainey*, 987 F.2d 1110, 1114 (5th Cir. 1992) ("The contour, or standard, for a constitutional right may expand after the time of the alleged violation, and may be the benchmark for proof at trial of that right and its claimed violation; but as stated, the benchmark for objective

reasonableness is that which existed at the time of the alleged violation -- we look to the clearly

established law at that time."). In summary, the two-pronged qualified immunity test inquires first

whether the defendant's conduct violated the plaintiff's clearly established constitutional rights and,

second, whether the defendant's conduct was nonetheless objectively reasonable in light of legal

principles as they existed at that time. *Haverda v. Hays County*, 723 F.3d 586, 598 (5th Cir. 2013);

*Wyatt v. Fletcher*, 718 F.3d at 502; *Prison Legal News v. Livingston*, 683 F.3d 201, 224 (5th Cir.

2012).

     The Fifth Circuit Court of Appeals has also repeatedly encouraged the district courts to (1)

require highly fact-specific pleading by a plaintiff in a §1983 lawsuit who attempts to overcome a

plea of *Harlow* qualified immunity (*Reyes v. Sazan*, 168 F.3d 158, 161 (5th Cir. 1999); *Baker v.

Putnal*, 75 F.3d 190, 195 (5th Cir. 1996); *Todd v. Hawk*, 72 F.3d 443, 446 (5th Cir. 1995); *Schultea

v. Wood*, 47 F.3d 1427, 1430 (5th Cir. 1995)); and (2) permit limited discovery pending disposition

of the qualified immunity issue only in those extraordinary situations in which the specific facts

contained in the plaintiff's pleadings and affidavits are sufficient to defeat the defendant's claims

of qualified immunity. *Reyes v. Sazan*, 168 F.3d at 161. This heightened pleading requirement

applies to *pro se* litigants. *Jackson v. City of Beaumont Police Department*, 958 F.2d 616, 621 (5th

Cir. 1992); *Jacquez v. Procunier*, 801 F.2d 789, 793 (5th Cir. 1986). "[P]laintiffs must demonstrate

*prior to discovery* that their allegations are sufficiently fact-specific to remove the cloak of protection

afforded by an immunity defense." *Jackson v. City of Beaumont Police Department*, 958 F.2d at

620; *Reyes v. Sazan*, 168 F.3d at 161; *Babb v. Dorman*, 33 F.3d 472, 477 (5th Cir. 1994); *James v.

Sadler*, 909 F.2d 834, 838 (5th Cir. 1990) (holding questions regarding qualified immunity are

resolved on the face of the pleadings and with limited resort to pre-trial discovery). A complaint

52

which raises the likely issue of immunity cannot be cast in broad, vague, general, indefinite, or conclusory terms, but must include detailed facts supporting the contention that the plea of immunity cannot be sustained. *Gobert v. Caldwell*, 463 F.3d 339, 348 n.27 (5th Cir. 2006); *Michalik v. Hermann*, 422 F.3d 252, 262 (5th Cir. 2005); *Southard v. Texas Board of Criminal Justice*, 114 F.3d 539, 555 (5th Cir. 1997). Discovery related to the applicability of qualified immunity is appropriate only when factual issues exist as to the applicability of qualified immunity. *Gaines v. Davis*, 928 F.2d 705, 707 (5th Cir. 1991).

Although the exact statement of *Harlow* qualified immunity may vary from case-to-case, as explained above, the Supreme Court and the Fifth Circuit have consistently held that, in order for a civil rights defendant pleading *Harlow* immunity to be liable, the defendant official's conduct must have violated "clearly established statutory or constitutional rights of which a reasonable person would have known." *Ashcroft v. Al-Kidd*, 563 U.S. at ___, 131 S. Ct. at 2090; *Anderson v. Creighton*, 483 U.S. at 646 n.6, 107 S. Ct. at 3042 n.6; *Harlow v. Fitzgerald*, 457 U.S. at 818, 102 S. Ct. at 2738; *Wyatt v. Fletcher*, 718 F.3d at 502; *Easter v. Powell*, 467 F.3d at 462. If reasonable public officials could differ on the lawfulness of the defendant's actions, the defendant is entitled to qualified immunity. *See Lewis v. University of Texas Medical Branch*, 665 F.3d 625, 631 (5th Cir. 2011) (fact that reasonable minds could disagree on the propriety of the plaintiff's termination is insufficient to defeat a public officer's qualified immunity defense); *Zarnow v. City of Wichita Falls, Texas*, 500 F.3d 401, 407-08 (5th Cir. 2007) (if reasonable public officials could differ as to whether the defendant's actions were lawful, the defendant is entitled to immunity); *see also Malley v. Briggs*, 475 U.S. 335, 341, 106 S. Ct. 1092, 1096, 89 L. Ed. 2d 271 (1986) ("Defendants will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have

concluded that a warrant should issue; but if officers of reasonable competence could disagree on this issue, immunity should be recognized."). Whether the conduct of which the plaintiff complains violated clearly established law is essentially a legal question. *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S. Ct. 2806, 2815, 86 L. Ed. 2d 411 (1985).

In a Section 1983 lawsuit, the relevant inquiry is whether the legal right which the plaintiff asserts was violated was clearly established under federal law. *Pierce v. Smith*, 117 F.3d 866, 871 n.5 (5th Cir. 1997). Whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful act or omission generally turns on the "objective legal reasonableness" of the act or omission assessed in the light of the legal rules that were "clearly established" at the time it was taken. *Anderson v. Creighton*, 483 U.S. at 639, 107 S. Ct. at 3038. For the legal rules to be considered "clearly established," the contours of the right alleged to have been violated "must be sufficiently clear that a reasonable official would understand that what he is doing violates the right"; that is, "in the light of preexisting law the unlawfulness must be apparent." *Anderson v. Creighton*, 483 U.S. at 640, 107 S. Ct. at 3039. While there need not have been a specific ruling squarely in point on the issue in question, the law must have been sufficiently clear to put the official on notice of the impropriety of his actions. *Kinney v. Weaver*, 367 F.3d 337, 372 (5th Cir.), *cert. denied*, 543 U.S. 872 (2004); *Sanchez v. Swyden*, 139 F.3d 464, 466 (5th Cir.), *cert. denied*, 525 U.S. 872 (1998). The Fifth Circuit has directed courts to initially examine Supreme Court and Fifth Circuit precedent, i.e., "controlling authority," in the course of determining whether a legal principle is "clearly established"; the law of other Circuits may be considered when "a consensus of cases of persuasive authority [is] such that a reasonable officer could not have believed

54

that his actions were lawful." *McClendon v. City of Columbia*, 305 F.3d 314, 328 (5th Cir.) (*en banc*), *cert. denied*, 537 U.S. 1232 (2002).

The second step in the qualified immunity analysis is the determination of the objective reasonableness of the defendant's act or omission. Objective reasonableness is assessed in light of the legal rules clearly established at the time of the incident; an officer's conduct is not objectively reasonable when all reasonable officials would have realized the particular challenged conduct violated the constitutional provisions sued on. *See Hogan v. Cunningham*, 722 F.3d 725, 735 (5th Cir. 2013) (recognizing qualified immunity in excessive force case required not only examination of clearly established Fourth Amendment standards but also whether a right to remain free the degree of force used in a given situation was clear to a reasonable officer at the scene). The qualified immunity standard gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law. *Hunter v. Bryant*, 502 U.S. 224, 229, 112 S. Ct. 534, 537, 116 L. Ed. 2d 589 (1991); *Malley v. Briggs*, 475 U.S. 335, 343, 106 S. Ct. 1092, 1097, 89 L. Ed. 2d 271 (1986). In addition, merely negligent conduct on the part of a government official cannot meet the rather stringent standard for liability under Title 42 U.S.C. §1983. *Daniels v. Williams*, 474 U.S. 326, 331-34, 106 S. Ct. 662, 664-67, 88 L. Ed. 2d 662 (1986); *Davidson v. Cannon*, 474 U.S. 344, 347-48, 106 S. Ct. 668, 670-71, 88 L. Ed. 2d 677 (1986).

## VII. **Plaintiff's Federal Civil Claims Against Defendant Summerville**

The constitutional standard for providing medical care to *convicted prisoners* was stated in the Supreme Court's opinion in *Estelle v. Gamble*, 429 U.S. 97, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976). "[D]eliberate indifference to serious medical needs of prisoners constitutes the unnecessary

and wanton infliction of pain, proscribed by the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. at 104, 97 S. Ct. at 291; *Gobert v. Caldwell*, 463 F.3d 339, 345 n.13 (5th Cir. 2006). In *Estelle*, the Supreme Court held, in order to state a cognizable claim, a prisoner must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. at 106, 97 S. Ct. at 292. "A serious medical need is one for which treatment has been recommended or for which the need is so apparent that even laymen would recognize that care is required." *Gobert v. Caldwell*, 463 F.3d at 345 n.12. The Supreme Court's opinion emphasized that it was only the intentional denial or delaying of access to medical care that would support a judgment under §1983. *Estelle v. Gamble*, 429 U.S. at 104-06, 97 S. Ct. at 291-92; *Mendoza v. Lynaugh*, 989 F.2d 191, 195 (5th Cir. 1993) (holding delay in medical care can only constitute an Eighth Amendment violation if there has been deliberate indifference which results in substantial harm); *Walker v. Butler*, 967 F.2d 176, 178 (5th Cir. 1992) (holding "deliberate indifference" is the intentional denial or delay of access to medical care); *Varnado v. Lynaugh*, 920 F.2d 320, 321 (5th Cir. 1991) (holding unsuccessful medical treatment does not give rise to a § 1983 cause of action for deliberate indifference to a serious medical need). "In order to demonstrate deliberate indifference when alleging inadequate medical treatment, a prisoner must show that officials 'refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs.'" *Coleman v. Sweetin*, 745 F.3d 756, 765 (5th Cir. 2014); *Sama v. Hannigan*, 669 F.3d 585, 590 (5th Cir. 2012); *Easter v. Powell*, 467 F.3d 459, 464 (5th Cir. 2006); *Gobert v. Caldwell*, 463 F.3d at 346.

Negligent medical care does not constitute a valid Section 1983 claim. *See Sama v. Hannigan*, 669 F.3d at 590 ("unsuccessful medical treatment and acts of negligence or medical

malpractice do not constitute deliberate indifference, nor does a prisoner's disagreement with her medical treatment, absent exceptional circumstances"); *Gobert v. Caldwell*, 463 F.3d at 346 ("Unsuccessful medical treatment, acts of negligence, or medical malpractice do not constitute deliberate indifference, nor does a prisoner's disagreement with his medical treatment, absent exceptional circumstances."); *Mendoza v. Lynaugh*, 989 F.2d at 195 (holding delay in the provision of medical services violates the Eighth Amendment only if there is deliberate indifference which results in substantial harm to the plaintiff). An incorrect diagnosis by prison medical personnel does not suffice to state a claim of deliberate indifference. *Domino v. Texas Department of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001); *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir. 1985). Delay in medical care can only constitute an Eighth Amendment violation if there has been deliberate indifference which results in substantial harm. *Coleman v. Sweetin*, 745 F.3d at 765-66; *Easter v. Powell*, 467 F.3d at 464. The Fifth Circuit has consistently applied this standard. *Norton v. Dimazana*, 122 F.3d 286, 291-92 (5th Cir. 1997); *McCormick v. Stalder*, 105 F.3d 1059, 1061 (5th Cir. 1997); *Banuelos v. McFarland*, 41 F.3d 232, 235 (5th Cir. 1995); *Mendoza v. Lynaugh*, 989 F.2d at 195; *Walker v. Butler*, 967 F.2d at 178; *Varnado v. Lynaugh*, 920 F.2d at 321; *McCord v. Maggio*, 910 F.2d 1248, 1251 (5th Cir. 1990); *Wesson v. Oglesby*, 910 F.2d 278, 283 (5th Cir. 1990); *Jackson v. Cain*, 864 F.2d 1235, 1244 (5th Cir. 1989); *Payne v. Lynaugh*, 843 F.2d 177, 178 (5th Cir. 1988); *Thompkins v. Belt*, 828 F.2d 298, 303-05 (5th Cir. 1987).

Under exceptional circumstances, a prison official's knowledge of a substantial risk of harm may be inferred by the obviousness of the substantial risk. *Farmer v. Brennan*, 511 U.S. 825, 842 & n.8, 114 S. Ct. 1970, 1982 & n.8, 128 L. Ed. 2d 811 (1994); *Reeves v. Collins*, 27 F.3d 174, 176 (5th Cir. 1994). The Fifth Circuit has described "deliberate indifference" as a refusal to treat the

plaintiff, ignoring the plaintiff's complaints, intentionally treating the plaintiff incorrectly, or engaging in similar conduct that would clearly evince a wanton disregard for any serious medical needs. *Domino v. Texas Department of Criminal Justice*, 239 F.3d at 756. Furthermore, the failure to alleviate a significant risk that the official should have perceived but did not is insufficient to show deliberate indifference. *Farmer v. Brennan*, 511 U.S. at 838, 114 S. Ct. at 1979; *Domino v. Texas Department of Criminal Justice,* 239 F.3d at 756.

In plaintiff's case, however, it is undisputed he was a *pretrial detainee*, rather than a prisoner, during the time frame September 20, 2012 through December 13, 2013, at which time plaintiff was convicted and sentenced for the offense of murder as defined by Section 19.02(b)(3) of the Texas Penal Code. *See* Exhibits 1 & 2 attached to Defendant Garcia's Motion to Dismiss, filed June 18, 2015 (ECF no. 38).[9] Therefore, insofar as plaintiff alleges he received inadequate medical care from defendant Summerville in September, 2012, the Fourteenth Amendment's standard governs review of plaintiff's inadequate medical care claims against all the defendants herein.

The difference in plaintiff's status during the relevant time frame is important because the Due Process Clause of the Fourteenth Amendment accords pretrial detainees rights not enjoyed by convicted inmates under the Eighth Amendment prohibition against cruel and unusual punishment. *Bell v. Wolfish*, 441 U.S. 520, 535-39, 99 S. Ct. 1861, 1871-74, 60 L. Ed. 2d 447 (1979); *Colle v. Brazos County, Texas*, 981 F.2d 237, 244 (5th Cir. 1993) (holding that, while a convicted prisoner has an Eighth Amendment right to be free from cruel and unusual punishment, a pretrial detainee

---

[9] Defendant Garcia has furnished this Court with copies of the indictment and Judgment issued December 17, 2013 in Bexar County criminal cause no. 2013-CR-8655. It is undisputed plaintiff was indicted for the offense of murder and convicted after a jury trial on that charge with a deadly weapon finding.

has a Fourteenth Amendment right to be free from punishment altogether); *Cupit v. Jones*, 835 F.2d 82, 84-85 (5th Cir. 1987).  While a sentenced inmate may be punished in any fashion not cruel and unusual, the Due Process Clause forbids punishment of a person held in custody awaiting trial but not yet adjudged guilty of any crime.  *Colle v. Brazos County, Texas*, 981 F.2d at 244; *Cupit v. Jones*, 835 F.2d at 84-85.  Therefore, the critical distinction between prisoners and pretrial detainees requires this Court determine whether a particular condition or restriction of pretrial detention was reasonably related to a legitimate governmental objective; if it was, it did not, without more, amount to punishment.  *Bell v. Wolfish*, 441 U.S. at 539, 99 S. Ct. at 1874; *Cupit v. Jones*, 835 F.2d at 85.

"A pretrial detainee's right to medical care is violated if 'an officer acts with deliberate indifference to a substantial risk of serious medical harm and resulting injuries.'"  *Brown v. Strain*, 663 F.3d 245, 249 (5th Cir. 2011); *Mace v. City of Palestine*, 333 F.3d 621, 625-26 (5th Cir. 2003).  The standard for review of the quality and character of the medical care received by a pretrial detainee under the Due Process Clause of the Fourteenth Amendment is whether the pretrial detainee received reasonable medical care, unless the failure to supply such care was reasonably related to a legitimate governmental objective.  *Hare v. City of Corinth*, 135 F.3d 320, 327 (5th Cir. 1998); *Nerren v. Livingston Police Department*, 86 F.3d 469, 473-74 (5th Cir. 1996); *Rhyne v. Henderson County*, 973 F.2d 386, 391 (5th Cir. 1992); *Mayweather v. Foti*, 958 F.2d 91 (5th Cir. 1992); *Pfannstiel v. City of Marion*, 918 F.2d 1178, 1186 (5th Cir. 1990); *Simpson v. Hines*, 903 F.2d 400, 404 (5th Cir. 1990); *Van Cleave v. United States*, 854 F.2d 82, 84 (5th Cir. 1988); *Thomas v. Kippermann*, 846 F.2d 1009, 1010-11 (5th Cir. 1988); *Cupit v. Jones*, 835 F.2d at 85.  On several occasions, the Fifth Circuit has noted that the distinction between the Fourteenth Amendment's standard, i.e., reasonable medical care free from subjective deliberate indifference to serious medical

needs, and the standard set forth by *Estelle v. Gamble* may be more ethereal than substantial. *Gibbs v. Grimmette*, 254 F.3d 545, 548 (5th Cir. 2001) (holding there is no significant difference between pretrial detainees and convicted inmates concerning basic human needs such as medical care), *cert. denied*, 534 U.S. 1136 (2002); *Hare v. City of Crointh*, 74 F.3d 633, 643 (5th Cir. 1996); *Simpson v. Hines*, 903 F.2d at 404; *Thomas v. Kippermann*, 846 F.2d at 1011; *Cupit v. Jones*, 835 F.2d at 85.

The Fifth Circuit has held that a pretrial detainee's due process right to medical care is violated by a state official's episodic act or omission if the official acts with subjective deliberate indifference to the detainee's rights. *Brown v. Strain*, 663 F.3d at 249 ("To show subjective deliberate indifference, a plaintiff must present evidence: (1) that each defendant had subjective knowledge of 'facts from which an inference of substantial risk of serious harm could be drawn,' (2) that each defendant actually drew that inference; and (3) that each defendant's response to the risk indicates that the appellee 'subjectively intended that harm occur.'"); *Tamez v. Manthey*, 589 F.3d 764, 770 (5th Cir. 2009) (holding the same); *Mace v. City of Palestine*, 333 F.3d at 625-26; *Thompson v. Upshur County, Texas*, 245 F.3d 447, 458-59 (5th Cir. 2001); *Wagner v. Bay City*, 227 F.3d 316, 324 (5th Cir. 2000); *Olabisiomotosho v. City of Houston*, 185 F.3d 521, 526 (5th Cir. 1999); *Sibley v. Lemaire*, 184 F.3d 481, 489 (5th Cir. 1999), *cert. denied*, 529 U.S. 1019 (2000); *Nerren v. Livingston Police Department*, 86 F.3d at 473; *Hare v. City of Corinth*, 74 F.3d 633, 647-48 (5th Cir. 1996). The Fifth Circuit has defined "subjective deliberate indifference" as subjective knowledge of a substantial risk of serious medical harm, followed by a response of deliberate indifference. *Olabisiomotosho v. City of Houston*, 185 F.3d at 526; *Sibley v. Lemaire*, 184 F.3d at 489; *Nerren v. Livingston Police Department*, 86 F.3d at 473-74; *Hare v. City of Corinth*, 74 F.3d at 650. Put more simply, the pretrial detainee must show the state official knew of and disregarded

an excessive risk to the inmate's health or safety. *Gibbs v. Grimmette*, 254 F.3d at 549; *Stewart v. Murphy*, 174 F.3d 530, 534 (5th Cir. 1999). Deliberate indifference in this context is more than mere negligence in failing to supply medical treatment; likewise, disagreement with medical treatment alone cannot support a claim under Section 1983. *Mace v. City of Palestine*, 333 F.3d at 626 (holding officer must have a subjective intent to cause harm); *Gibbs v. Grimmette*, 254 F.3d at 549-50 (holding a Sheriff's refusal to order a tuberculosis skin test for a pretrial detainee who had not been exposed to an active TB case was not deliberate indifference even though convicted prisoners received such tests annually pursuant to state law); *Williams v. Treen*, 671 F.2d 892, 901 (5th Cir. 1982); *Norton v. Dimazana*, 122 F.3d 286, 292 (5th Cir. 1997).

The uncontroverted proper summary judgment evidence now before this Court establishes, following a motor vehicle accident on September 19, 2012, plaintiff was hospitalized at University Hospital and underwent surgery to repair a comminuted fracture of his right femur.[10]   While

---

[10] Plaintiff's University Hospital Medical Records accompanying authenticating affidavit of Karen Rochester, collectively attached as Exhibit A to Cheryl Ann Summerville's Motion for Leave to File Documents Under Seal, filed September 3, 2015 (ECF no. 68) (henceforth "ECF no. 68 Medical Records"), at pp. 139-48. Dr. Boris Zelle was plaintiff's surgeon in September, 2012 and on each of the two subsequent surgeries needed to fully correct plaintiff's comminuted fracture. ECF no. 68 Medical Records, at pp. 88-114, 143-48; Plaintiff's BCADC Medical Records accompanying authenticating affidavit of Karen Rochester, filed as Custodian of Records Affidavit on September 3, 2015 (ECF no. 71) (henceforth ECF no. 71 Medical Records"), at pp. 68-86, 88-105.
    Dr. Zelle's highly detailed notes record that (1) he initially operated on plaintiff's right femur on September 20, 2012 to repair extensive damage done in plaintiff's motor vehicle accident, (2) an x-ray on October 16, 2012 revealed damage to the hardware Dr. Zelle had installed at the fracture site the month before and improper alignment of the right femur, (3) a second surgical procedure, similar to the first, was performed October 19, 2012 to replace the damaged hardware and realign the fracture into proper position, (4) plaintiff's right femur did not heal fully, (5) a third surgical procedure, which included a bone graft of tissue removed from plaintiff's hip, was successfully performed on February 8, 2013, and (6) in the following months, plaintiff's fractured right femur slowly healed until plaintiff no longer needed to use a cane to

convalescing at University Hospital, plaintiff was detained in the controlled access unit and was

examined and treated for a wide range of maladies, including his fractured and surgically repaired

right femur, fractured ribs, injuries to his left hand, and a psychotic episode on September 25, 2012

which continued until shortly before his discharge on September 29, 2012. Defendant Summerville

helped treat plaintiff in the University Hospital's controlled access unit for a relatively brief period,

i.e., from September 23-25, 2012.[11] There is no proper summary judgment evidence currently before

---

walk. ECF no. 71 Medical Records, at pp. 68-86, 88-105.

[11] Defendant Summerville has furnished an affidavit in which she states, in pertinent part, as follows:

> On September 25, 2012 when I started my shift I received a report from the outgoing nursing staff that during the day, David Rodriguez had become hyper vigilant, increasingly more anxious and agitated and exhibiting paranoid behavior. I was told that he had been carving names in a Styrofoam cup and i observed him reading the names carved in the cup. David Rodriguez was seen by Psychiatrist Marlon Quinones who ordered Risperdal pm to treat this psychotic disorder.
>
> When I checked on him on September 25, 2012 at 4:20, I found that he was anxious, restless and was speaking rapidly. He complained to me that me [sic] no one had checked up on him; that the officers were drunk the night before; and that someone in the hall had been talking about him. When I attempted to assess his pain in order to determine if he needed pain medications, he was unable to stay focused or answer my questions. I administered Risperdal, 2 mg orally as ordered by his physician. Rodriguez did not refuse to take the Risperdal, but he did refuse his pain medications; therefore he was not given any pain medications. After he took the Risperdal, Rodriguez became less anxious and restless. *At 10:00 p.m. that evening David Rodriguez told me that he did not want to take any of his medications. I explained to him the benefits of taking the medications and encouraged him to take the Risperdal and other prescribed medications. He then agreed to take the Risperdal and the Docusate, which i then administered. he refused his Lovenox, which I did not administer.* (Emphasis added)
>
> Never at any time did I administer any medication using force and at no time did I witness Officer Garcia force Rodriguez to take any medications against his will. He continued to refuse offers of pain medications, so they were not given to him. At the end of my shift, I gave a report to the oncoming shift. I have learned that the incident involving a struggle with Officer Garcia occurred during a shift change. I did not witness the incident and do not have personal knowledge about what happened inside the patient's room as the door was closed. Medical

this Court establishing either (1) defendant Summerville had any personal involvement in, or

personal knowledge of, the incident on the night of September 25, 2012 in which plaintiff and

defendant Garcia engaged in a physical altercation, (2) defendant Summerville had any personal

involvement in, or personal knowledge of, the examination, diagnosis, or treatment of plaintiff for

any injury or medical condition in the aftermath of that incident, or (3) defendant Summerville had

any personal involvement in *the decision by University Hospital physicians* to prescribe

antipsychotic medication for plaintiff on September 25, 2012 due to plaintiff's undisputed exhibition

of paranoia, hallucinations, and other behavior indicative of a psychotic episode.[12]

---

personnel are generally not involved in this type of incident as this is left to law
enforcement personnel.
      After I gave report to the oncoming nurse, I left the hospital. It is true that
I never recorded the incident between Officer Garcia and David Rodriguez. I
never saw any guard assault David Rodriguez. I was not advised about the
incident until after I handed over care to the oncoming shift. The incident is
recorded in the patient's medical record by the nurse who assumed care. I did not
see Rodriguez again during this hospital admission. The medical records reflect
that he was seen by multiple providers (nurses, orthopedic surgeons, psychiatrists)
who evaluated his condition on a daily basis and provided care to him as needed.
Affidavit of Cheryl Ann Summerville, RN, attached as Exhibit B to Cheryl Ann Summerville's
Notice of Filing of Summary Judgment Evidence, filed September 2, 2015 (ECF no. 69)
(henceforth "Summerville Affidavit"), at pp. 3-4.

[12] This Court has reviewed the video file furnished by both parties (by plaintiff as part of
his unauthenticated USB drive submission made in ECF no. 22 and by defendant Garcia along
with the business records affidavit of Timothy Walston authenticating the video file of the
incident in question contained on the CD-ROM accompanying ECF no. 60). That video shows a
portion of the plaintiff's hospital room on the evening of September 25, 2012 from a little after
10:36 PM, when an adult male patient clad in a hospital gown (presumably plaintiff) rises from a
sitting position on his bed and hops out of view of the camera to the left of the screen, until
approximately 10:49 PM the same evening, when the adult male patient (by then in handcuffs) is
seen limping off screen to the left in the custody of two black-clad guards. At no point in the
video does any female appear. The only persons who appear on that video are plaintiff, three
black-clad guards, and a *male* hospital employee who appears only briefly for a few seconds on
two occasions after the hospital patient has been placed on the floor.

Plaintiff's properly authenticated medical records show, in pertinent part, that (1) beginning at approximately 2:21 PM on September 25, 2012, multiple requests for Risperdal were placed to the University Hospital pharmacy for plaintiff,[13] (2) defendant Summerville's only involvement in those requests appears to be a nursing note generated by her around 2:44 PM on September 25, 2012 requesting "Please send dose not stocked in Pyxis",[14] (3) defendant Summerville administered Acetaminophen to plaintiff on September 23 and 24, 2012,[15] (4) she administered 2 mg of Morphine Sulfate at approximately 5:46 PM on September 24, 2012,[16] and (5) she administered 2 mg of Risperdal to plaintiff at 4:20 PM on September 25, 2012 and the same dose again at 10:00 PM on September 25, 2012.[17] Plaintiff's authenticated University Hospital medical records also show that the nurse who worked the shift during the early morning hours of September 25, 2012 wrote a nursing note around 6:33 AM stating, in part as follows:

> Asleep until 0400. Then began hyperactivity. Picking up and putting down water cup. Shifting bed linen and pillows about. Pressured, rapid, loud, speech. Not meeting eye contact. Calling to the deputy the need for a phone call to Central Investigation Division. "because I have all these names in my head to tell them". Carving the "names" into a plastic cup. Asking if he called out anything. Speaking in whispers at times. Hypervigilant.[18]

A nursing note written by another nurse around 12:42 PM on September 25, 2012 reads as follows:

---

[13] ECF no. 68 Medical Records, at pp. 115-29, 131-34..

[14] ECF no. 68 Medical Records, at p. 123.

[15] *Id.*, at p. 134.

[16] *Id.*, at p. 137.

[17] *Id.*, at pp. 132, 138.

[18] *Id.*, at p. 156.

PT continues with hypervigilant, paranoid behavior.  Became increasingly more anxious and agitated, telling nursing staff that he is "afraid" and ready to name names.  Whispering at times so as not to be overheard in hallway.  Kept referring to the man in the hat with the broken jaw who was outside his room last night.  PT rambling about "they found the guns I had hidden and brought all 7 of them up here. They had them out in the hallway last night.  I could hear them talking."  Attempts to reassure and calm pt were ineffective.  GSE on call was notified and Psych on unit to talk with patient.  Psych is recommending routine and pm Risperdal for psychotic disorder.  Notified GSE of Psych's recommendations.  Door to patient's room was closed for destimulation.  Pt is currently lying horizontally on bed reading the piece of styrofoam cup that he has etched with names.[19]

The report of a psychiatric evaluation performed on plaintiff by Dr. Marlon Quinones on the afternoon of September 25, 2012 states, in pertinent part, that (1) plaintiff was suffering from a psychotic disorder,[20] (2) "Behavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost al areas,"[21] (3) "This is a 31yo male without any prior known or reported psych h/s now endorsing AVH and paranoid delusions few days after getting involved in a police chase that resulted in a MVA that injured several people and killed two children. Pt is difficult to interview given his high degree of agitation. Pt will be started on antipsychotics and we will reassess him,"[22] (4) plaintiff's mood was described as "anxious" and "fearful," and his relatedness was described at "guarded, defensive, suspicious,"[23] (5) plaintiff's concentration was described as "mildly impaired" and his thought processes were

---

[19] *Id.*, at p. 159.

[20] *Id.*, at p. 159.

[21] *Id.*, at p. 160.

[22] *Id.*

[23] *Id.*

described as "illogical" and "abnormal,"[24] (6) plaintiff was experiencing auditory and visual hallucinations and "Pt appears to be responding to internal stimuli,"[25] and (7) plaintiff was experiencing "paranoid persecutory" delusions.[26]  Plaintiff does not attempt to contradict or dispute the factual accuracy of any of Dr. Quinones' observations or medical conclusions made during his evaluation of plaintiff on September 25, 2012.  Plaintiff has presented no proper summary judgment evidence suggesting Dr. Quinones' diagnosis or prescribed course of treatment were in any way factually erroneous or medically inappropriate under the circumstances.

Instead, plaintiff asserted in his sworn original complaint, in pertinent part, that defendant Summerville, defendant Garcia, and another deputy identified by plaintiff as "E. Garcia" entered plaintiff's room and "forced me to take a medication that I was refusing because I had never seen this medication before.  The medication was a pink cube that resembled a pink sugar cube.  J Garcia was thrusting forward towards me acting as if he was going to punch me.  So I took the medication."[27]  Plaintiff alleged further in his sworn original complaint as follows:

> I was 30 years old and had never suffered from psychosis.  About 30 or 45 minutes later, J. Garcia, Cheryl Ann, and E. Garcia returned, and forced me to take another dose of Risperdal which i refused.  I asked Cheryl Ann for water because I felt dehydrated.  Cheryl Ann brought water, and after I drunk [sic] from the cup I noticed she brought the water in a dirty cup which had a dirty body wipe, I had used to wipe

---

[24] *Id.*, at p. 161.

[25] *Id.*

[26] *Id.*

[27] Original Complaint, filed September 29, 2014 (ECF no. 1-1), at pp. 4 of 9 through 5 of 9 (i.e., plaintiff's handwritten addendum to his complaint).

my underarms, genitals, and anus earlier that day.  I told Cheryl Ann who shrugged her shoulders, as if to say that's all the water you are going to get.[28]

In a sworn pleading filed April 2, 2015 (ECF no. 20), plaintiff states "on 9-25-12 Plaintiff was asking to talk to a lawyer, and detectives.  Later Plaintiff was placed on antipsychotic medication, and began having hallucination's till he was taken off the antipsychotic medication."[29] In another sworn pleading filed April 20, 2015 (ECF no. 22), plaintiff states "plaintiff was started on antipsychotic medications which was [sic] later forced upon plaintiff by defendants.  Plaintiffs [sic] mental health quickly deteriorated, and plaintiff began to have hallucinations.  Until the antipsychotic medication was stoped [sic] on September 26, 2012.  On September 28, 2012, plaintiff resolved or became oriented with reality after the medication wore off.  The plaintiff was quickly released on September 29, 2012."[30]  In another sworn pleading, filed July 14, 2015 (ECF no. 40), plaintiff alleges as follows:

> (B) Violation of Plaintiff's Fourteenth Amendment to Due Process.   When Defendant's [sic] Jonathan Garcia and Cheryl Ann Summerville forced Plaintiff to injest [sic] antipsychotic medication not once, but twice.  Medical records show the medication was administered.  Johnathan Garcia, and Norma Lara both testified in Texas v. Rodriguez No, 2013 CR 8655 that Plaintiff was saying he was going to get poisoned with the medication, and was not cooperating with nurse's [sic], and Plaintiff was hesitant to take the medication.
>
> Plaintiff would bring to the courts [sic] attn throughout his stay up untill [sic] this point the medication administered was vicodine [sic] (2) white oval pills with red dots.  Then after reporting what he had seen the pre night with Deputy Fikks or Fikes then being taunted and threatened for almost 24 hours the two Defendants come in

---

[28] *Id.*, at p. 5of 9 (handwritten addendum to complaint).

[29] Plaintiff's "Show of and/or file of Documentation," filed April 2, 2015 (ECF no. 20), at p. 5 of 5.

[30] Plaintiff's "Show and/or File of Documentation and Admissions," filed April 20, 2015 (ECF no. 22), at p. 4 of 5.

with (2) vicodine [sic], and what looks like a pink sugar cube (Risperdal). Plaintiff then stated "what is that", "I have never been given that before", "I don't want that", "Im [sic] refusing the medication", "I refuse it" Plaintiff said these words with his face facing the camera so that maybe later they can be interpreted through the video which does not have sound. Cheryl Ann Summerville then said "its doctors orders" She then looked at J. Garcia who them put his self [sic] in the position as if he was going to punch Plaintiff (left foot slightly in front of the right, right hand slightly cocked back) and said to Plaintiff "if you don't [sic] take it we will make you take it" there was another Officer behind Cheryl Ann Summerville who is unknown to Plaintiff. So Plaintiff injested [sic] the medication to avoid a [sic] altercation and/or being assaulted. They later returned with a second dose of Risperdal this incident was very similar to the first and as in the first Plaintiff injested [sic] the medication because J./ Garcia's threat to strike him. Plaintiff believes that the surveillance video from the camera in the room will show these events the way he described then, and even though these is no audio on this footage the defendants body language will show what Plaintiff has described. This is video footage Plaintiff has been trying to obtain but has been unsuccessful.[31]

Contrary to plaintiff's assertions that he was taken off all antipsychotic medications shortly after the incident on September 25, 2012, the plaintiff's properly authenticated medical records reveal that, while Risperdal was first administered on September 25 discontinued on September 26, 2012, plaintiff's treating physicians began prescribing and administering 5 mg of the antipsychotic medication Haldol when they discontinued Risperdal and plaintiff's physicians continued to medicate plaintiff with Haldol until after plaintiff was discharged to the BCADC on September 29, 2012.[32] Likewise, contrary to plaintiff's assertions, the plaintiff's uncontradicted medical records establish Dr. Quinones diagnosed plaintiff with hallucinations *prior* to plaintiff ever receiving the antipsychotic medication Risperdal.[33] Furthermore, plaintiff's nursing records for September 25,

---

[31] Plaintiff's Response to Jonathan Garcia Defendant's Motion to Dismiss, filed July 14, 2015 ECF no. 40), at pp. 2-3.

[32] ECF no. 68 Medical Records, at pp. 126-29, 131, 136, 138, 163-85, 187-92.

[33] *Id.*, at p. 161.

2012 state, in pertinent part, that (1) plaintiff took 2 mg of Risperdal at 16:20 but refused pain medications at that time and (2) "22:00 Pt not wanting to take medications; lots of encouragement to take Risperdal.  Took Docusate without problem but refused Lovenox SC.  Able to transfer himself from bed to chair and back again, *but not following instructions to not bear weight to R leg. Refusing offers of pain meds this evening.*"[34]

Under the doctrine of qualified immunity, defendant Summerville's conduct on September 25, 2012 in twice administering 2 mg of Risperdal to plaintiff pursuant to the directions of plaintiff's treating psychiatrist at a time when plaintiff was engaged in floridly psychotic behavior, must be evaluated in light of clearly established constitutional law.  As early as 1990, the Supreme Court made it clear that forced administration of antipsychotic medication is permissible when a prisoner has a serious mental illness and is dangerous to himself and others. *See Washington v. Harper*, 494 U.S. 210, 227, 110 S. Ct. 1028, 1039-40, 108 L. Ed. 2d 178 (1990) ("We hold that, given the requirements of the prison environment, the Due Process Clause permits the State to treat a prisoner who has a serious mental illness with antipsychotic drugs against his will, if the inmate is dangerous to himself or others and the treatment is in the inmate's medical interest.").  In *United States v. Loughner*, 672 F.3d 731, 744-52 (9th Cir. 2012), decided only six months prior to plaintiff's arrest and altercation with defendant Garcia, the Ninth Circuit analyzed the Supreme Court's holdings in *Washington v. Harper* and subsequent Supreme Court decisions and concluded that, when state officials seek to medicate an individual in custody on grounds the person presents a danger to himself or others, the distinction between convicted prisoners and pretrial detainees is a distinction

---

[34] *Id.*, at p. 165 (Emphasis added).

without legal difference.  In *United States v. Palmer*, 507 F.3d 300, 303 (5th Cir. 2007), *cert. denied*, 555 U.S. 812 (2008), the Fifth Circuit recognized that "involuntary medication does not violate the due process clause if the inmate is a danger to himself or others and treatment is in the inmate's medical interest."   "*Harper* established that a prison inmate may be subjected to forced administration of psychotropic drugs to alleviate mental illness if the inmate posed a danger to himself or others and the treatment was in the inmate's medical interest." *McCormick v. Stalder*, 105 F.3d 1059, 1061 (5th Cir. 1997).

It appears undisputed that, when plaintiff declined to take his *pain* medications on September 25, 2012, he was not forced by anyone to take same.  Other than plaintiff's rambling narrative in his pleading filed July 14, 2015 (ECF no. 40), plaintiff's conclusory assertions that defendant Summerville somehow "forced" him to take Risperdal on September 25, 2012 are unaccompanied by any specific facts, much less any proper summary judgment evidence, showing precisely how defendant Summerville "forced" plaintiff to take that medication against his will.  Plaintiff neither alleges any specific facts nor furnishes any proper summary judgment evidence showing defendant Summerville, as opposed to defendant Garcia, made any threats or took any action to compel or coerce plaintiff to take his prescribed medication.  Plaintiff ignores the fact that, as a trained medical professional responsible for patient care at University Hospital, it was defendant Summerville's duty to attempt to "encourage" plaintiff and other hospital patients to take their prescribed medications. It is equally undisputed that, as of September 25, 2012, plaintiff had clearly engaged in reckless behavior which constituted a threat to others, i.e., plaintiff's reckless driving during a high speed police pursuit on September 19, 2012 caused a motor vehicle accident which left two small children dead. It is likewise clear from plaintiff's University Hospital medical records that plaintiff (1) voiced

70

suicidal thoughts, (2) displayed psychotic behavior, and (3) was noticeably agitated in the hours leading up to his altercation with defendant Garcia.[35]  Plaintiff has presented no factual allegations or proper summary judgment evidence showing Dr. Quinones' diagnosis or prescribed treatment (which included Risperdal) to be anything other than medically appropriate given plaintiff's obviously disturbed condition.

Plaintiff's assertion that he subjectively felt threatened by defendant Garcia does not establish that defendant Summerville engaged in objectively unreasonable conduct in attempting to encourage plaintiff to take antipsychotic medication prescribed by a licensed physician at a time when plaintiff was experiencing a floridly psychotic episode.  The Supreme Court has recognized the state possesses a legitimate interest in medicating dangerous individuals in its custody who present a danger to themselves and others.  Plaintiff's conduct on September 19 and again on September 25, 2012 establish beyond any doubt that plaintiff posed a threat to himself and others.  Moreover, as a hospital employee, defendant Summerville was not required to decline to administer plaintiff's antipsychotic medication simply because plaintiff, then in an obviously psychotic state, voiced an objection.[36]

Insofar as plaintiff contends he was constitutionally entitled to refuse to accept antipsychotic medication without first receiving a hearing before an administrative hearing officer or panel, plaintiff fails to present any proper summary judgment evidence showing, after she sought to

---

[35] ECF no. 68 Medical Records, at pp. 163-66.

[36] Plaintiff's floridly psychotic mental state on September 25, 2012 and the days thereafter is documented in his University Hospital medical records, ECF no. 68 Medical Records, at pp. 167-92, 204-10.

encourage him to take his medication, plaintiff ever informed defendant Summerville or anyone else at the hospital that he still wished to refuse his prescribed Risperdal in the same manner as he refused his prescribed pain medication. Plaintiff has presented this Court with no proper summary judgment evidence showing it was objectively unreasonable for defendant Summerville to offer plaintiff Risperdal or to encourage plaintiff to accept same after his initial statement that he did not wish to take the medication. It is true the Supreme Court has recognized that a state statute or regulation may create a constitutionally protected liberty interest for prisoners, and by extension to pretrial detainees, in avoiding the unwanted administration of antipsychotic medication. *See Washington v. Harper*, 494 U.S. at 221-22, 110 S. Ct. at 1036 ("respondent possesses a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs under the Due Process Clause of the Fourteenth Amendment"). That holding is tempered, however, by the Supreme Court's recognition in the same opinion that *prisoners who pose a danger to themselves or others* may be medicated against their will when medically necessary. *Washington v. Harper*, 494 U.S. at 227, 110 S. Ct. at 1039-40. As the Ninth Circuit and Fifth Circuit have both recognized, when dealing with mentally ill persons in custodial detention *who pose a danger to themselves or others*, the distinction between incarcerated persons and pretrial detainees is more ethereal than substantial.

As explained above, under the doctrine of qualified immunity, a defendant official's conduct must have violated "clearly established statutory or constitutional rights of which a reasonable person would have known." *Ashcroft v. Al-Kidd*, 563 U.S. at ___, 131 S. Ct. at 2090. The defense of qualified immunity protects a public employee even when the employee may violate a person's rights so long as the conduct of the employee was objectively reasonable in light of clearly established federal law. Plaintiff has alleged no facts and presented no proper summary judgment evidence

showing defendant Summerville was ever made aware by plaintiff or anyone else that plaintiff remained subjectively unconvinced by her "encouragement" when it came to taking his Risperdal. Qualified immunity protects defendant Summerville because plaintiff has presented no proper summary judgment evidence showing defendant Summerville was aware, after she encouraged plaintiff to take his medication, that plaintiff subjectively felt threatened or coerced by her or anyone else to accept Risperdal against his will.  Defendant Summerville was not required to exercise clairvoyance or to read plaintiff's mind when plaintiff accepted his prescribed Risperdal and consumed it.  This aspect of plaintiff's claims against defendant Summerville is essentially an argument that, despite the fact he accepted the Risperdal she offered to him and consumed same, he subjectively did not want to take it.  Given the clear holding in *Washington v. Harper* and plaintiff's clearly demonstrated propensity for violence, as seen in his reckless conduct on September 19, 2012 and his suicidal ideation on September 25, 2012, the doctrine of qualified immunity protects defendant Summerville with regard to her administration of two doses of Risperdal to plaintiff on September 25, 2012.  Even if plaintiff's acceptance of that medication was not truly voluntary, defendant Summerville's conduct was objectively reasonable under clearly established federal law.[37]

As explained above, plaintiff also alleges in cryptic fashion in his sworn original complaint and in an unsworn pleading (ECF no. 19) that defendant Summerville brought him water in a drinking cup which contained a dirty body wipe plaintiff had used to clean himself earlier.  The only specific facts supporting this complaint which plaintiff alleges in semi-coherent form and presents

---

[37] As explained above, plaintiff's citations to a federal statute (18 U.S.C. § 4241) addressing mental competency determinations for federal criminal defendants and prisoners and a BOP regulation (28 C.F.R. § 549.43) addressing federal prisoners and detainees do not, on their faces, apply to him.

in proper summary judgment form appear in a sworn pleading plaintiff filed June 18, 2015 (ECF no.

34):

> Page 5, number (24) states, (nurse Cherly [sic] Ann later brought plaintiff a cupp [sic] of water into which she had placed a dirty body wipe plaintiff had used to wipe down his body, and plaintiff drank from the cup before noticing the dirty body wipe contained therein.) What happened was dehydrated do [sic] to the resperdal [sic] I was forced to take so I asked the nurse Cheryl Ann reapeatdly [sic] for water. So she finally brought me water in a used cup I had used earlier in the day, the cup contained dirty body wipes I used to clean my underarms, testicles, and anus. (I would also address the court's [sic] that there are no trash bins located in the inmates [sic] hospital room, and on a daily basis trash is gathered by the Licensed Vacationbal [sic] Nurse's [sic] and discarded which in this case it was not.) Cherly [sic] Ann finally brought me water in this used cup that was left in the room. I drunk [sic] from the cup before I noticed that the cup was old/used, and contained the dirty body wipes. I informed Cherly [sic] Ann showed her the wipe. She made a jesture [sic] by shrugging her shoulders as if to say (so what thats [sic] all the water you are going to get.) I was so thirsty, I remember I could feel my lips dry, and beginning to blister so I drunk [sic] the water. I would also like to note in all my time in this hospital about a little over a month in total, any time a RN, or LVN brought water, the water was always brought in a fresh or new cup with ice. Not every time but I have to say 98% of the time. I also believe when Cherly [sic] Ann opened the lid to fill the used cup with water she would have noticed the wipe inside.[38]

It is apparent from plaintiff's "affidavit" that the water cup in question had a lid on it.

Plaintiff does not allege any specific facts or furnish any proper summary judgment evidence stating

that he personally witnessed defendant Summerville place a dirty body wipe into the cup in question.

Likewise, plaintiff does not allege any facts or furnish any proper summary judgment evidence

showing that he personally witnessed defendant Summerville fill the allegedly dirty water cup or

otherwise lift the lid from the allegedly dirty water cup and look inside the cup before or while filling

same. Under such circumstances, plaintiff has failed to present any proper summary judgment

---

[38] Plaintiff's Affidavit of Notification of Error, filed June 18, 2015 (ECF no. 34), at pp. 2-3.

evidence showing defendant Summerville actually knew the cup in which she served water to plaintiff contained a dirty body wipe. The proper summary judgment evidence now before the Court fails to show that defendant Summerville ever knowingly or intentionally served plaintiff water in a cup containing a dirty body wipe. Plaintiff alleges, at most, that defendant Summerville failed to check the drinking cup before refilling same and serving the cup to plaintiff. At best, plaintiff's speculative assertions regarding defendant Summerville's actions and plaintiff's allegedly dirty water cup rise to the level of mere negligence, which is not actionable under Section 1983. *See Kingsley v. Hendrickson*, ___ U.S. ___, ___ 135 S. Ct. 2466, 2472, 192 L. Ed. 2d 416 (2015) ("liability for *negligently* inflicted harm is categorically beneath the threshold of constitutional due process." (quoting *County of Sacramento v. Lewis*. 523 U.S. 833, 849, 118 S. Ct. 1706, 140 L. Ed. 2d 1043 (1998))). Defendant Summerville is entitled to summary judgment with regard to plaintiff's complaints about his allegedly dirty drinking cup.

Plaintiff's University Hospital medical records establish that, contrary to plaintiff's naked assertions in his sworn and unsworn pleadings, plaintiff was examined and treated for all his injuries throughout his stay at that facility in September, 2012, there was no "twenty-two hour, ten minute gap" in his medical records, and all medications and other procedures furnished to plaintiff, including the restraints in which plaintiff was placed on September 25, were prescribed by licensed physicians as part of plaintiff's course of medical treatment. The fact that such medical care may not have given the plaintiff the relief he requested as quickly as the plaintiff would have wished does not establish a constitutional deprivation. *Varnado v. Lynaugh*, 920 F.2d at 321 (holding unsuccessful medical treatment does not give rise to a § 1983 cause of action for deliberate indifference to a serious medical need). A mere disagreement between an inmate and his physician

concerning whether certain medical care was appropriate is actionable under Section 1983 only if there are exceptional circumstances. *Norton v. Dimazana*, 122 F.3d at 291-92; *McCormick v. Stalder,* 105 F.3d at 1061 (dismissing as frivolous a prisoner's complaint that he was forced to undergo medical treatment for Tuberculosis after he tested positive for same during his incarceration); *Banuelos v. McFarland*, 41 F.3d at 235. Medical records of sick calls, examinations, diagnosis, treatment, and medications may rebut an inmate's allegations of deliberate indifference. *Banuelos v. McFarland*, 41 F.3d at 235; *Mendoza v. Lynaugh*, 989 F.2d at 193-95; *Norton v. Dimazana,* 122 F.3d at 292 (recognizing that while a plaintiff's properly authenticated medical records may not refute a plaintiff's testimony, they can assist the court in determining whether the plaintiff's complaint is frivolous). Allegations of malpractice or negligence will never state a claim under the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. at 105-06, 97 S. Ct. at 292; *Hall v. Thomas*, 190 F.3d at 697. Plaintiff's medical records effectively rebut all of plaintiff's complaints against defendant Summerville, whose actions were objectively reasonable under clearly established federal law. Because she is entitled to the protection of the doctrine of qualified immunity, defendant Summerville is entitled to summary judgment with regard to all of plaintiff's claims against her, including plaintiff's conclusional assertions this defendant denied plaintiff adequate medical care. *See Kitchen v. Dallas County, Texas*, 759 F.3d 468, 482 (5th Cir. 2014) (holding jail guards entitled to summary judgment in absence of evidence showing the guards were deliberately indifferent to a substantial health risk to the plaintiff).

## VIII. Plaintiff's Federal Civil Rights Claims Against Defendant Garcia

Insofar as plaintiff alleges defendant Garcia violated plaintiff's federal constitutional rights by threatening or coercing plaintiff into taking antipsychotic medication on September 25, 2012, for

the same reasons discussed in Section VII above, like defendant Summerville defendant Garcia is

entitled to the defense of qualified immunity and a summary judgment. *See McCormick v. Stadler*,

105 F.3d at 1061 ("*Harper* established that a prison inmate may be subjected to forced

administration of psychotropic drugs to alleviate mental illness if the inmate posed a danger to

himself or others and the treatment was in the inmate's medical interest.").

Likewise, for the same reasons set forth in Section VII above, defendant Garcia is entitled

to summary judgment with regard to plaintiff's complaints defendant Garcia denied plaintiff

adequate medical care on September 25-29, 2012. *See Kitchen v. Dallas County, Texas*, 759 F.3d

at 482 (holding jail guards entitled to summary judgment in absence of evidence showing the guards

were deliberately indifferent to a substantial health risk to the plaintiff).

Insofar as plaintiff alleges defendant Garcia employed excessive force against plaintiff on

September 25, 2012, plaintiff has alleged in unsworn pleadings: After plaintiff closed his hospital

room door without authorization, defendant Garcia (1) opened the door with a key, (2) entered the

plaintiff's hospital room, (3) tackled plaintiff violently, breaking plaintiff's leg in the process, and

(4) proceeded to strike plaintiff and wrestle with plaintiff over control of his gun. More specifically,

in an unsworn affidavit accompanying his original complaint, plaintiff alleges that, after an extended

time period in which defendant Garcia allegedly verbally threatened plaintiff and taunted plaintiff

with comments of "baby killer," the following took place:

> As he [defendant Garcia] walked down the hall he said your [sic] nothing but a [sic]
> explicit baby killer. I believe the drugs had effected [six[ my judgement. I hoped
> [sic] on one leg and slammed the door closed. J. Garcia then came through the door
> spear tackling me like a football player shattering my femur, and bending the
> hardware just placed in my leg. J. Garcia then began punching me in the back of the
> head over and over as I was face down on the floor. I then tried to defend my self by

77

getting him off of me, and holding him down. I never punched or kicked him. When I did manage to get him off of me I noticed my leg twisted underneth [sic] him. Several other officers came in J. Garcia then got on top of me again and began holding me down by the neck so I could not breath.[39]

Plaintiff furnishes a more detailed account of his version of the altercation with defendant

Garcia in another unsworn pleading filed July 14, 2015 (ECF no. 40):

Now Plaintiff would like to give the courts further detail, when he previously stated after being attacked by J. Garcia I began to defend myself.

Now after I closed the door J. Garcia began yelling through the door to open the door. I tried to open the door but saw you needed a key to open it from the inside I yelled back I cant [sic] open it you need a key. The door knob was moving or jangling hard. So I stepped back or hopped back towards the wall but it was not the wall I leaned on it was the door to the restroom. I then hopped from the door with the right side of my body facing the door. The door flew open and J. Garcia came running in slamming the door behind him he spear tackled me and I was face down underneath his body. He began punching me in back and on top. of my head. Only then under Necessity where conduct is justified if (G) the actor reasonably believes the conduct is immediately necessary to avoid imminent harm) and Duress (a) It is an affirmative defense to prosecution that the actor engaged in the prosecution that the actor engaged in the proscribed conduct because he was compelled to do so by threat of imminent death or serious bodily injury to himself or another.) and basic instinct I did a push v [sic] with him on my back. Placed my hand on his face and pushed hard. I saw his glasses fly. Now only his torso was on my legs I saw my leg badly crooked, so I pushed his torso. I then mounted his back and he began to thrash wildly. I placed my left arm with the splint behind his neck and placed pressure. I then with my right hand grabbed his firearm because of two death threats he made to me earlier. I had previously owned a glock model 22 40 caliber very similar and also purchased a I believe it was black ha[undecipherable] holster also very similar. All you do is push the [undecipherable] that releases the lock in the trigger guard and when you pull the pistol out you do so in a downward motion to avoid the second lock. This was not my intention to pull out his weapon I only wanted to get him to stop hitting and assaulting me, and I did not want him to use his gun to shot [sic] me. He then flatened [sic] his fist and said "if I have to shoot you it will only be in the arm or leg" I quickly got off him not because his words but because his hands he gave up. I stood back while he got up never looking at me. I saw his broken,

---

[39] Plaintiff's Original Complaint, filed September 29, 2014 (ECF no. 1-1) (handwritten, unsworn "affidavit" attached thereto), at pp. 6 of 9.

handcuffs, and other items all over the room.  The door began to open and when I looked away he tackled me again this time I was on my back and he began choking me with his forearm.  While all the other officers entered the room.  I was then taken to the single man holding cell and later the room where I was tied to the bed.

In my opinion, J. Garcia instigated, iniciated [sic] and knowingly and intentionally assaulted Plaintiff while being in possession of a deadly weapon. Bringing the deadly weapon into the assault is similar to assault with a deadly weapon.  Then losing control of the situation, and his firearm putting Plaintiff, staff, officers, the public, along with his self [sic] in danger. because of his bad judgment, and abuse of his authority, by attacking a [sic] already injured person all because of some kind of ego trip.[40]

Needless to say, defendant Garcia furnishes a very different account of the incident in question, one which is substantiated in significant part by the video recording of the incident which both parties have furnished the Court.  More specifically, in his affidavit accompanying his motion to dismiss, defendant Garcia states in pertinent part as follows:

Inmate David Rodriguez, SID No. 746546 (CAU-820 #2) was under my custody at the controlled access unit.  At that time, I was aware that inmate Rodrguez was incarcerated awaiting trial for murder.  I was also aware he was suffering from hallucinations and paranoia.  Further, during the time I spent with inmate Rodriguez, I witnessed him say things that indicated to me he was paranoid.

At approximately 22:50 hours, I witnessed inmate Rodriguez go to his hospital room door and shut it which automatically locked it.  Inmates in the controlled access unit are not allowed to close or lock the doors to their rooms.  I then heard the restroom door shut as well and some banging in the room.

I unlocked the door with my keys.  As I entered the room, inmate Rodriguez charged towards me with both his hands outstretched to grab me.  I was then forced to place him on the floor.  I instructed him to turn on his stomach and stay still.  He would not comply.  I repeated instructions but he still resisted.  I attempted to place him on his stomach but he kept resisting.  I then had to grab his right hand in order to restrain him.  We struggled.  He attempted to grab my pistol while saying, "I'm going to die anyway, just get it over with."  he did get his hand on my pistol, but was unable to remove my pistol from the holster.  After he failed to get my weapon, he tried to reach for my face and eyes as well as reaching for my throat.  During this

[40] Plaintiff's Response to Jonathan Garcia Defendant's Motion to Dismiss, filed July 14, 2015 (ECF no. 40), at pp. 25-27.

episode, I lost my handcuff key. After I was able to get him to turn on his stomach, other Deputies entered the room to assist me.

    During this encounter with inmate Rodriguez I believed he posed a significant danger to me, other inmates, other law enforcement officers, hospital staff and the general public. I was aware he suffered from hallucinations and paranoia and that he was accused of murder. I could not allow him to escape or gain control of my weapon. I did not use my pistol, baton or any other weapon at any time during my encounter with inmate Rodriguez. I applied the minimum force necessary to subdue inmate Rodriguez and prevent him from arming himself.[41]

    In addition, plaintiff's properly authenticated medical records, the video recording of the incident in question, and the other proper summary judgment evidence before this Court establish there is no genuine issue of material fact that (1) plaintiff's right femur was "shattered" during plaintiff's automobile accident on September 19, 2012 *not*, as plaintiff asserts in his original complaint, during plaintiff's altercation with defendant Garcia on September 25,[42] (2) contrary to

_____

[41] Affidavit of Deputy Jonathan Garcia, attached to Defendant Garcia's Motion to Dismiss, filed June 18, 2015 (ECF no. 38-4), at pp. 1-2.

[42] Plaintiff's emergency room evaluation upon his arrival at the University Hospital on September 19, 2012 is found at ECF no. 68 University Hospital Medical Records, at pp. 139-42. Dr. Zelle's findings during his surgery to repair plaintiff's right femur are detailed in his notes found at ECF no. 68 Medical records, at pp. 143-48. Among Dr. Zelle's findings during surgery was that plaintiff has sustained a significantly comminuted right distal femur fracture with a significant intercondylar split. *Id.*, at p. 146. Dr. Zelle's notes detail the extensive surgical procedure necessary to reduce and realign plaintiff's right femur fracture. *Id.*, at pp. 146-48. Thus, plaintiff's right femur has sustained a very significant injury as of September 19, 2012 which required extensive surgical intervention and repair.

    Plaintiff was examined and treated in the University Hospital and later at the BCADC's infirmary for a wide range of complaints, including his on-going complaints of right leg pain, during the period between his initial surgery on September 20, 2012 and the date of his follow up examination by Dr. Zelle on October 16, 2012. ECF no. 68 University Hospital Medical Records, at pp. 1-28, 115-31, 149-92; ECF no. 71 BCADC Medical Records, at pp. 1-31. Those records, particularly those from the BCADC during the period September 29-October 16, 2012, are filled with notations indicating plaintiff was in "no acute distress," voiced no complaints, and was able to move from bed to wheel chair and back without difficulty.

    Plaintiff's x-ray on October 16, 2012 revealed damage to the plate that had been installed during plaintiff's September surgery, specifically, angulation of fifteen degrees across the

plaintiff's unsworn assertions, at no point during the altercation on September 25, 2012 did plaintiff

take control of defendant Garcia's firearm,[43] (3) contrary to plaintiff's unsworn assertions, at no point

---

fracture site and mild apex anterior angulation. ECF no. 71 BCADC Medical Records, at pp. 31-33, 104-05. Dr. Zelle's post-surgical notes following plaintiff's second surgery on October 19, 2012 reveal plaintiff suffered damage to the hardware previously installed and mis-alignment of the fracture, both of which were repaired during the second surgery, but no "shattering" of the bones was noted during plaintiff's original September, 2012 surgery. Id., at pp. 104-05.

[43] The video recording both parties presented to the Court shows plaintiff hopping up and out of bed at approximately 22:36:55, then around his bed, and off screen to the viewer's left. There is nothing of significance on screen again until approximately 22:37:23, when one of more bodies can be seen on the floor behind a chair along the left side of the screen. A second or so later, a chair is pushed to the right. While it difficult to make out, by 22:37:33, it appears there are two bodies on the floor along the left side of the screen. At 22:37:41, plaintiff is off screen to the left once again, shortly after which both persons disappear to the left. At 22:37:46, both bodies appear again along the left side of the screen and both appear to be on the floor. They continue their struggle on the floor for several more seconds. By 22:38:17, plaintiff is seen clearly kicking his broken leg in an apparent effort to hold the other person down on the floor. At 22:38:29, plaintiff appears to be on top of the other person. At 22:38:32, the black clad guard grabs plaintiff and pushes plaintiff up and back as both bodies rise up and then tumble away from the bottom of the screen with the black clad guard apparently on top. Within a few seconds, plaintiff appears to be on his back on the floor. The black clad guard hold plaintiff down but does not deliver any blows that are visible. Plaintiff attempts to squirm away from the guard at 22:39:09 but the guard remains on top and begins to attempt to roll plaintiff over on to plaintiff's stomach. At 22:39:41, plaintiff attempts to kick the guard with his broken right leg and then to swing his right leg up and across the guard's hip. Plaintiff continues to struggle intermittently while the guard maintains control despite being unable to turn plaintiff on to his stomach. At 22:40:24, another guard enters the room and is visible at the bottom left corner of the screen. By 22:40:47, the two guards, working together, manage to get plaintiff on to his stomach. At 22:41:14, a person dressed in hospital scrubs enters the room and begins putting on gloves then walks around the room and tosses a pillow off plaintiff's bed. At 22:41:47, plaintiff attempts to roll back on to his back but is pushed back down. At 22:42:32, one of the guards moves a chair away from plaintiff. At 22:42:42, a person in hospital scrubs begins putting shackles on plaintiff's ankles. That process is completed by 22:43:53. At 22:43:22, another person in hospital scrubs enters the room and briefly stands over plaintiff's legs. At 22: 43:54, both guards stand back from plaintiff, who is lying on his stomach on the floor but his wrists have not been secured in handcuffs. At 22:44:10, a third guard enters the room and looks down on plaintiff. By 22:44:16, plaintiff's arms are in front of him as he continues to lie on his stomach. At 22:45:04, plaintiff, whose hands are still not in handcuffs, rolls on to his left side and converses with one of the guards. At 22:45:20, one of the guards assumes a position standing above plaintiff's back with one foo on either side of plaintiff's torso. Plaintiff remains on his stomach

during the altercation on September 25, 2012 did plaintiff stand up when other Deputies entered his

hospital room,[44] and (4) contrary to plaintiff's unsworn assertions, defendant Garcia did not tackle

plaintiff a second time after other Deputies entered the plaintiff's hospital room.[45]  Thus, the vast

majority of plaintiff's allegations about the incident on September 25, 2012 are refuted by the

uncontradicted video and medical evidence now before the Court.

Not every second of the altercation between defendant Garcia and plaintiff was recorded by

the video camera in plaintiff's hospital room.  As explained above, in their affidavits and unsworn

pleadings, plaintiff and defendant Garcia furnish two very different versions of the events which they

assert occurred when defendant Garcia unlocked plaintiff's hospital room door after plaintiff closed

the door without authorization: plaintiff alleges defendant Garcia rushed into the room, violently

tackled plaintiff in the manner of a football player, and subsequently choked and struck plaintiff

about the head and neck; in contrast, defendant Garcia asserts plaintiff charged at defendant Garcia,

attacked defendant Garcia, and attempted to gain control of defendant Garcia's weapon.  The

discrepancies between the two versions of how the altercation began, however, must be viewed in

---

on the floor for a couple minutes.  At 22:47:57, plaintiff is rolled to his left side.  At 22:48:14
plaintiff is assisted to a sitting position.  At 22:48:41, plaintiff is assisted to a standing position
by tow guards.  By 22:48:47, plaintiff limps off screen to the left with the assistance of two
guards.

[44] On the video presented by both parties this Court, plaintiff never stood on his own at
any time after the altercation between plaintiff and defendant Garcia began.

[45] At no point in the video is defendant Garcia seen tackling plaintiff/ The closest thing to
a "tackle" shown on the video occurs at approximately 22:38:32 when the guard (presumably
defendant Garcia) pushes the plaintiff (who was at that time on top of defendant Garcia)
backward and assumes a position on top of plaintiff.  At the time of that maneuver, the two men
had been wrestling with each other on the floor for at least a full minute.  No other deputy
entered the plaintiff's room until 22:40:24.

the context of the proper summary judgment evidence now before the Court which establishes (1) plaintiff deliberately closed his hospital room door after hopping around his bed and several feet across the floor to the door, (2) plaintiff moved to the door in a manner inconsistent with his doctor's orders to he keep all weight off his fractured leg, (3) during the altercation, plaintiff attempted to take control of defendant Garcia's handgun, (4) during their altercation plaintiff repeatedly kicked defendant Garcia with his broken right leg, (5) for several weeks after the altercation plaintiff was observed in no acute distress while residing in the BCADC's infirmary, and (6) when x-rays were taken of plaintiff's right leg in mid-October, 2012, the metal hardware previously installed at the fracture site was bent approximately fifteen degrees but there was no indication of any post-surgical "shattering" of plaintiff's femur as asserted by plaintiff in his Original Complaint. Finally, it is undisputed that, at the time of the altercation (1) plaintiff was charged with having killed a child while attempting to flee at a high rate of speed from a police pursuit, (2) plaintiff was exhibiting paranoid delusions and suicidal ideation, and (3) plaintiff verbally expressed the desire to die.

Recently, the Supreme Court has declared that claims of excessive force brought under Section 1983 by pretrial detainees must be reviewed under an objective standard. *See Kingsley v. Hendrickson*, ___ U.S. at ___, 135 S. Ct. at 2473-74 ("a pretrial detainee can prevail by providing only objective evidence that the challenged governmental action is not rationally related to a legitimate governmental objective or that it is excessive in relation to that purpose."). As explained above, however, defendant Garcia is entitled to the protection afforded by the doctrine of qualified immunity, which protects public officers and employees from liability for conduct which was objectively reasonable under then-clearly established federal law. At the time of the altercation between plaintiff and defendant Garcia, the officer's conduct must have demonstrated a subjective

awareness of a substantial risk of serious harm and a failure to take reasonable measures to abate this risk. *See Kitchen v. Dallas County, Texas*, 759 F.3d at 482. The Court agrees with defendant Garcia's expert witness that the conduct of defendant Garcia, which is substantiated by the video recording, appears in all respects to have been objectively reasonable in view of the legitimate governmental interest in maintaining order and decorum inside the University Hospital's controlled access unit and in preventing plaintiff, an actively psychotic patient, from obtaining control over defendant Garcia's weapon (something plaintiff candidly admits he attempted to accomplish during his fight with defendant Garcia). Plaintiff's uncorroborated self-serving assertions are not enough to raise a genuine issue of material fact when the remainder of the record fully supports defendant Garcia's assertions and refutes plaintiff's version of the events. *See, e.g., Jackson v. Cal-Western Packaging Corp.*, 602 F.3d 374, 379 (5th Cir. 2010) (holding that plaintiff's uncorroborated, self-serving statements were insufficient to create a triable issue of fact); *United States v. Lawrence*, 276 F.3d 193, 197 (5th Cir. 2001) (affirming summary judgment for plaintiff where defendant's only evidence consisted of "self-serving allegations," which "are not the type of significant probative evidence required to defeat summary judgment"); *BMG Music v. Martinez*, 74 F.3d 87, 91 (5th Cir. 1996) (affirming summary judgment for plaintiffs where "the only evidence in support of the defendants' theory is a conclusory, self-serving statement by the defendant"). Given plaintiff's psychotic condition, suicidal ideation, and clearly demonstrated propensity for violent conduct, this Court concludes the conduct of defendant Garcia did not violate the standard of subjective unreasonableness required under clearly established federal law in this Circuit for an excessive force claim at the time of the altercation between the two men on September 25, 2012.

Defendant Garcia correctly argues plaintiff was experiencing a psychotic episode, actively hallucinating, and intent upon committing suicide by officer at the time of the incident on September 25, 2012.[46] The undisputed video evidence shows: (1) plaintiff clearly instigated the incident by hopping around his bed and closing his hospital room door, something he acknowledges he was not authorized to do and (2) defendant Garcia's actions in attempting to gain control of plaintiff and keep plaintiff from gaining control over defendant Garcia's firearm were all eminently reasonable under the circumstances. Plaintiff had no right to close his hospital room door or to seek to gain control of defendant Garcia's weapon. Nothing in the video recording properly before the Court shows defendant Garcia employing anything other than reasonable force to subdue plaintiff, who not only actively resisted defendant Garcia throughout their altercation but attempted to gain control of defendant Garcia's weapon. Confronted with a psychotic, suicidal patient, defendant Garcia's conduct did not exceed the level of subjective reasonableness applicable at the time of the incident in question. Defendant Garcia is entitled to the protection afforded by the doctrine of qualified immunity and to a summary judgment on plaintiff's excessive force claim.

## IX. Plaintiff's Federal Civil Rights Claims Against the Bexar County Hospital District

For the same reasons discussed at length in Section IV above, plaintiff is not entitled to recover a judgment against the Bexar County Hospital District. Plaintiff has failed to identify any person exercising final decision-making or policymaking authority for the Hospital District who had any personal involvement in or personal knowledge of any of the matters about which plaintiff

---

[46] Plaintiff admits he told defendant Garcia during the altercation "I'm going to die anyway, just get it over with." Plaintiff's Response to Defendant Garcia's Requests for Admission, filed September 30, 2015 (ECF no. 92), at p. 3.

complains in this lawsuit. Plaintiff has also failed to identify any formal policy, widespread practice, or longstanding custom attributable to final Hospital District policymakers which actually caused a violation of plaintiff's federal constitutional rights. For the reasons discussed in Section VII above, plaintiff's constitutional right to adequate medical care was not violated during plaintiff's post-surgical stays in the University Hospital or during plaintiff's periods of convalescence at the BCADC. On the contrary, plaintiff's uncontradicted medical records establish Bexar County Hospital District employees furnished plaintiff with continuous, objectively reasonable, medical care and treatment for a wide variety of maladies, including a severely fractured right femur, broken ribs, injuries to his left hand, and his psychotic episode.[47]

Plaintiff's complaint that he was held in physical restraints for sixty-two consecutive hours despite his fractured leg ignores the uncontradicted summary judgment evidence now before this Court showing those restraints were *prescribed by physicians* at a time when plaintiff was experiencing a psychotic episode and had failed to respond favorably to the anti-psychotic medications Risperdal and Haldol.[48] Moreover, the restraints were prescribed only after plaintiff

---

[47] Dr. Zelle's detailed reports on each of his three surgeries on plaintiff's right femur and post-operative examinations appear scattered throughout plaintiff's medical records. A detailed report on plaintiff's first surgery on September 20, 2012 appears at ECF no. 68 University Hospital Medical Records, at pp. 143-48. A detailed report on Plaintiff's October 19, 2012 surgery appears at ECF no. 68 University Hospital Medical Records, at pp. 109-11. Post-operative reports on plaintiff's October 19, 2012 surgery appear at ECF no. 68 University Hospital Medical Records, at pp. 102-03, 104-05, 107-08. A detailed report on plaintiff's February 8, 2013 surgery and bone graft appears at ECF no. 71 BCADC Medical records, at pp. 96-99. A post-operative report on plaintiff's February 8, 2013 surgery (which included a bone graft) appears at ECF no. 68 University Hospital Medical Records, at pp. 93-94. Additional post-operative reports following plaintiff's February, 2013 surgery appear at ECF no. 71 BCADC Medical Records, at pp. 88-95.

[48] Restraints were prescribed for plaintiff on September 25, 2012 by physician Alejandra Pena following her evaluation of plaintiff less than ninety minutes after the altercation with

engaged in a violent altercation with a guard during which plaintiff attempted to gain control of the

officer's weapon and expressed suicidal ideation.[49]  Plaintiff has presented this Court with no

summary judgment evidence showing use of the restraints were contra-indicated by any other

information properly before plaintiff's treating physicians.  A mere disagreement between an inmate

and his physician concerning whether certain medical care was appropriate (including the use of

restraints to prevent a psychotic patient who has engaged in violent behavior from harming himself

and others) is actionable under Section 1983 only if there are exceptional circumstances.  *Norton v.*

*Dimazana*, 122 F.3d at 291-92; *McCormick v. Stalder,* 105 F.3d at 1061.  Plaintiff has failed to

present any proper summary judgment evidence showing the use of restraints to confine him during

his actively psychotic episode September 25-28, 2012 was objectively unreasonable or constituted

deliberate indifference to a substantial risk of serious medical harm.  On the contrary, as the video

---

defendant Garcia. ECF no. 68 University Hospital Medical Records, at pp. 125, 165-66. A nurse's note from September 27, 2012 reflects the opinion that restraints should be continued. *Id.*, at p. 130. Plaintiff's University Hospital medical records also reveal (1) at 11:33 PM on September 25, plaintiff was continuing to fight his restraints, (2) at 10:21 AM on September 26, plaintiff was restless and agitated, (3) at 1:30 PM on September 26, plaintiff was still agitated and not following commands, (4) at 4:21 PM on September v26, the decision was made to continue restraints and start plaintiff on Haldol because plaintiff was experiencing "acute psychotic agitation," (5) at 5:32 PM on September 26, plaintiff was in four-point restraints and the Haldol had not yet sedated him, (6) at 6:24 PM September 26, plaintiff was still agitated, (7) at 3:56 AM on September 27, plaintiff was still agitated and restrained, (8) at 7:49 AM on September 27, plaintiff was in a five point restraint which he continued to fight and demonstrated aggressive behavior, responding to unseen stimuli, (9) at 9:41 AM on September 27, plaintiff was noted as suffering from active psychotic disorder, (10) at 1:00 PM on September 27, plaintiff was displaying confusion and remained in restraints, (11) at 5:05 PM on September 27, plaintiff's prescribed Haldol was increased to 20 mg at bedtime and 5 mg every eight hours, (12) at 5:36 PM on September 27, the nursing note indicates to continue restraints, and (13) by 2:00 PM on September 28, however, plaintiff had shown profound improvement, restraints were discontinued, and plaintiff was able to participate in a physical therapy session. ECF no. 68 University Hospital Medical Records, at pp. 165-92, 204-09.

[49] ECF no. 68 University Hospital Medical Records, at pp. 8,

recording and medical records before the Court establish (1) plaintiff engaged in a violent confrontation with a guard on September 25, 2012, (2) during that altercation, plaintiff attempted to secure control of the guards's firearm, and (3) plaintiff continued thereafter to experience an active psychotic disorder for which physicians prescribed restraints and an increasingly powerful regimen of antipsychotic medications. There is no proper summary judgment evidence now before this Court establishing there was anything objectively unreasonable with the course of medical treatment prescribed by plaintiff's treating physicians for plaintiff's psychotic episode. The Bexar County Hospital District is entitled to a summary judgment on all of plaintiff's federal civil rights claims.

## X. Standard for Review Under Sections 1915(e) (2) (B) & 1915A

When Congress enacted the Prison Litigation Reform Act of 1996 ["PLRA"], it specifically amended Title 28 U.S.C. Section 1915(e) (2) (B) (i) and added new Section 1915A to provide that a complaint filed by a prisoner could be dismissed as frivolous regardless of whether any filing fee or portion thereof had been paid. *Martin v. Scott*, 156 F.3d 578, 579-80 (5th Cir. 1998), *cert. denied*, 527 U.S. 1041 (1999). Therefore, plaintiff's claims herein are subject to review under Section 1915(e) and dismissal as frivolous regardless of whether he paid any portion of the filing fee in this cause. *See Ruiz v. United States*, 160 F.3d 273, 275 (5th Cir. 1998) (holding the federal district courts are required to dismiss any action brought by a prisoner that is frivolous, malicious, fails to state a cause of action, or seeks monetary damages from a defendant who is immune from such relief); 42 U.S.C. §1997e(c).

Title 28 U.S.C. Section 1915(e) accords judges not only the authority to dismiss a claim based on an indisputably meritless legal theory, but also the unusual power to pierce the veil of the

complainant's factual allegations and dismiss those claims whose factual contentions are clearly baseless. *Denton v. Hernandez*, 504 U.S. 25, 31-32, 112 S. Ct. 1728, 1733, 118 L. Ed. 2d 340 (1992); *Neitzke v. Williams*, 490 U.S. 319, 327, 109 S. Ct. 1827, 1833, 104 L. Ed. 2d 338 (1989); *Schultea v. Wood*, 47 F.3d 1427, 1434 (5th Cir. 1995). The Prison Litigation Reform Act of 1996, effective April 26, 1996, moved the relevant statutory provision addressing dismissal for frivolousness from former subsection (d) of Section 1915 to new subsection (e) (2) (B) and expanded the scope of that statute to expressly authorize dismissals of lawsuits as frivolous regardless of whether a filing fee or any portion thereof had been paid. *Jackson v. Stinnett*, 102 F.3d 132, 136-37 (5th Cir. 1996); 28 U.S.C. §1915(e) (2) (B) (i).

In an action filed *in forma pauperis*, a court may raise sua sponte the issue of whether an action is malicious or frivolous under Section 1915(e). *Neitzke v. Williams*, 490 U.S. at 327, 109 S. Ct. at 1833; *Harris v. Hegmann,* 198 F.3d 153, 156 (5th Cir. 1999), (holding it appropriate for a district court to *sua sponte* determine whether a claim was barred by limitations); *Schultea v. Wood*, 47 F.3d at 1434. Dismissal of a claim as frivolous under Section 1915(e) is permissible where the claim lacks an arguable basis either in law or in fact. *Neitzke v. Williams*, 490 U.S. at 325, 109 S. Ct. at 1831; *Rogers v. Boatright*, 709 F.3d 403, 407 (5th Cir. 2013); *Harris v. Hegmann*, 198 F.3d at 156; *Ruiz v. United States*, 160 F.3d 273, 274 (5th Cir. 1998); *Gonzales v. Wyatt*, 157 F.3d 1016, 1019 (5th Cir. 1998); *Davis v. Scott*, 157 F.3d 1003, 1005 (5th Cir. 1998); *Martin v. Scott*, 156 F.3d at 580 (holding frivolous complaints by a prisoner in administrative segregation regarding restrictions on his recreation and visitation time, possession of personal property, ability to purchase items from the commissary, denial of desert, required jump suit, handcuffs during all transfers, and food that included Vita-Pro); *McCormick v. Stalder*, 105 F.3d 1059, 1061 (5th Cir. 1997); *Krueger*

89

*v. Reimer*, 66 F.3d 75, 77 (5th Cir. 1995); *Biliski v. Harborth*, 55 F.3d 160, 162 (5th Cir. 1995); *Boyd v. Biggers*, 31 F.3d 279, 281 (5th Cir. 1994); *Eason v. Thaler*, 14 F.3d 8, 9 (5th Cir. 1994); *Booker v. Koonce*, 2 F.3d 114, 116 (5th Cir. 1993). In this case, however, plaintiff was specifically informed at least as early as the Magistrate Judge's Show Cause Order of the many potential problems with plaintiff's original complaint, including the fact plaintiff had asserted claims against a group of individuals who were protected by the doctrine of qualified immunity (ECF no. 4).

A complaint lacks an arguable basis in law if it is based on an indisputably meritless legal theory. *Rogers v. Boatright*, 709 F.3d at 407; *Samford v. Dretke*, 562 F.3d 674, 678 (5th Cir. 2009); *Harris v. Hegmann*, 198 F.3d at 156; *Harper v. Showers*, 174 F.3d 716, 718 (5th Cir. 1999); *Talib v. Gilley*, 138 F.3d 211, 213 (5th Cir. 1998). A complaint lacks an arguable basis in fact if, after providing the plaintiff the opportunity to present additional facts when necessary, the facts alleged are clearly baseless. *Denton v. Hernandez*, 504 U.S. at 32-33, 112 S. Ct. at 1733-34; *Rogers v. Boatright*, 709 F.3d at 407; *Brewster v. Dretke*, 587 F.3d 764, 767-68 (5th Cir. 2009) (holding dismissal as frivolous appropriate after the plaintiff is given an opportunity to amend or allege additional facts through answers to a post-complaint questionnaire), *cert. denied*, 560 U.S. 944 (2010); *Samford v. Dretke*, 562 F.3d at 678; *Harris v. Hegmann*, 198 F.3d at 156 (holding a complaint is factually frivolous when the facts alleged are fantastic or delusional or the legal theory upon which a complaint relies is indisputably meritless); *Davis v. Scott*, 157 F.3d at 1005, (holding the Magistrate had no duty to ask specific questions during a *Spears* hearing and that the plaintiff remains master of his complaint and is responsible for articulating the facts that give rise to a cognizable claim); *Talib v. Gilley*, 138 F.3d at 213.

Typical examples of claims which can be dismissed pursuant to Section 1915(e) include (1) claims against which it is clear that the defendants are immune from suit (*Neitzke v. Williams*, 490 U.S. at 327, 109 S. Ct. at 1833; *Krueger v. Reimer*, 66 F.3d at 76-77 (upholding the dismissal as frivolous of civil rights lawsuits on the grounds that the defendants were entitled to absolute judicial and prosecutorial immunity; *Boyd v. Biggers,* 31 F.3d at 284-85) (holding the same)); (2) claims of infringement of a legal interest that clearly does not exist (*Neitzke v. Williams*, 490 U.S. at 327, 109 S. Ct. at 1833; *Longoria v. Dretke*, 507 F.3d 898, 901 (5th Cir. 2007) (upholding dismissal as frivolous of complaints about prison grooming regulations); *Davis v. Scott*, 157 F.3d at 1005 (holding, absent allegations the plaintiff suffered a physical injury, plaintiff's complaints that he was assigned to a filthy cell for three days did not raise even an arguable basis for relief under the Eighth Amendment); *Hicks v. Garner*, 69 F.3d 22, 25 (5th Cir. 1995) (holding a state prisoner possessed no constitutionally-protected right to grow a beard or his hair long); *Biliski v. Harborth*, 55 F.3d at 162 (holding that a state prisoner's equal protection claims arising out of his being housed at a County jail did not invoke any federal constitutional rights); *Wilson v. Budney*, 976 F.2d 957, 958 (5th Cir. 1992) (affirming the dismissal as frivolous of a claim by a convicted prisoner that he had been denied the opportunity to attend religious and educational classes with the general inmate population based upon his diagnosis as a mental patient)); and (3) claims which are barred by limitations (*Harris v. Hegmann*, 198 F.3d at 156; *Moore v. McDonald*, 30 F.3d 616, 620 (5th Cir. 1994); *Gartrell v. Gaylor*, 981 F.2d 254, 259 (5th Cir. 1993); *Henson-El v. Rogers*, 923 F.2d 51, 53 (5th Cir.), *cert. denied*, 501 U.S. 1235 (1991).

In reviewing a complaint under Section 1915(e), a court is not bound to accept without question the truth of the plaintiff's allegations. *Denton v. Hernandez*, 504 U.S. at 32, 112 S. Ct. at

1733; *Ancar v. Sara Plasma, Inc.*, 964 F.2d 465, 468 (5th Cir. 1992). A court may dismiss a claim as factually frivolous only if the facts alleged are clearly baseless, fanciful, fantastic, delusional, or otherwise rise to the level of the irrational or the wholly incredible, regardless of whether there are judicially noticeable facts available to contradict them. *Denton v. Hernandez*, 504 U.S. at 32-33, 112 S.Ct at 1733; *Harris v. Hegmann*, 198 F.3d at 156; *Gartrell v. Gaylor*, 981 F.2d 254, 259 (5th Cir. 1993). A district court may dismiss an in forma pauperis proceeding as frivolous under 28 U.S.C. § 1915(e) whenever it appears that the claim has no arguable basis in law or fact. *Stanley v. Foster*, 464 F.3d 565, 569 (5th Cir. 2006) (upholding dismissal as frivolous of prisoner's complaint about the confiscation of a medical pass that was re-issued the same date it was confiscated); *Geiger v. Jowers*, 404 F.3d 371, 373-74 (5th Cir. 2005) (upholding dismissal as frivolous of prisoner's complaints (1) about alleged failure of prison officials to investigate prisoner's grievances against prison mail room and security staff, (2) of retaliation based upon plaintiff's failure to exhaust administrative remedies, and (3) about allegedly negligent loss of property); *Velasquez v. Woos*, 329 F.3d 420, 421 (5th Cir. 2003) (upholding dismissal as frivolous of prisoner's complaint about collection of DNA sample from plaintiff); *McCormick v. Stalder*, 105 F.3d at 1061 (dismissing as frivolous a prisoner's complaint that he was forced to undergo medical treatment for Tuberculosis while incarcerated); *Thompson v. Patteson*, 985 F.2d 202, 205 (5th Cir. 1993); *Gartrell v. Gaylor*, 981 F.2d at 259; *Henthorn v. Swinson*, 955 F.2d 351, 352 (5th Cir.), *cert. denied*, 504 U.S. 988 (1992). In the course of making that determination, a federal court may employ an evidentiary hearing (as suggested by the Fifth Circuit's opinion in *Spears v. McCotter*, 766 F.2d 179, 180-81 (5th Cir. 1985)), or a questionnaire (as suggested by the Fifth Circuit's opinions in *Talib v. Gilley*, 138

92

F.3d at 213; *Macias v. Raul A.*, 23 F.3d 94, 97 (5th Cir. 1994), *cert. denied*, 513 U.S. 883 (1994); and *Parker v. Carpenter*, 978 F.2d 190, 191 (5th Cir. 1992)).

In an action proceeding under Section 1915(e), a federal court may consider *sua sponte* affirmative defenses that are apparent from the record even where they have not been addressed or raised in the pleadings on file. *Harris v. Hegmann*, 198 F.3d at 156 (recognizing the propriety of a district court's raising the defense of limitations *sua sponte*); *Schultea v. Wood*, 47 F.3d at 1434 (recognizing the authority of the district court to dismiss an action based on the doctrine of qualified immunity); *Gartrell v. Gaylor*, 981 F.2d at 259; *Ali v. Higgs*, 892 F.2d 438, 440 (5th Cir. 1990) (limitations); *Burrell v. Newsome*, 883 F.2d 416, 418 (5th Cir. 1989) (limitations). Significantly, the court is authorized to test the proceeding for frivolousness or maliciousness even before service of process or before the filing of an answer. *Brewster v. Dretke*, 587 F.3d at 767 ("The district court may dismiss an *in forma pauperis* proceeding 'before service of process or before the filing of the answer' as long as certain safeguards are met."); *Harris v. Hegmann*, 198 F.3d at 156; *Schultea v. Wood*, 47 F.3d at 1434; *Gartrell v. Gaylor*, 981 F.2d at 259; *Ali v. Higgs*, 892 F.2d at 440; *Burrell v. Newsome*, 883 F.2d at 418.

A case is not frivolous simply because it fails to state a claim. *Neitzke v. Williams*, 490 U.S. at 331, 109 S. Ct. at 1834; *Booker v. Koonce*, 2 F.3d at 115; *Gartrell v. Gaylor*, 981 F.2d at 259; *Ancar v. Sara Plasma, Inc.*, 964 F.2d at 468. However, if the claim has no arguable basis in law or fact, the complaint can be dismissed under Section 1915(e). *Gartrell v. Gaylor*, 981 F.2d at 259; *Parker v. Carpenter*, 978 F.2d 190, 191 n.1 (5th Cir. 1992); *Mayfield v. Collins*, 918 F.2d 560, 561 (5th Cir. 1990). "A complaint is legally frivolous if it is premised on an 'undisputably meritless legal theory.'" *Boyd v. Biggers*, 31 F.3d at 281-82 (quoting *Neitzke v. Williams*, 490 U.S. at 327, 109

S. Ct. at 1833).   An In Forma Pauperis complaint that recites bare legal conclusions, with no suggestion of supporting facts, or that postulates facts of an entirely fanciful nature, is a prime candidate for dismissal under Section 1915(e).   *Ancar v. Sara Plasma, Inc.*, 964 F.2d at 468 (complaints that are clearly baseless include those which describe fanciful, fantastic, or delusional scenarios); *Gartrell v. Gaylor*, 981 F.2d at 259; *Wesson v. Oglesby*, 910 F.2d at 281.   Furthermore, when it is clear from the face of the complaint that the claims asserted are subject to an obvious meritorious defense, such as a peremptory time bar, dismissal with prejudice is appropriate.   *Graves v. Hampton*, 1 F.3d 315, 319-20 (5th Cir. 1993).

## XI. Plaintiff's Federal Civil Rights Claims Against the Nurse's Aides

Plaintiff alleges James Last Name Unknown secured plaintiff to a bed in a four-point restraint.   For the reasons discussed in Section IX above, the decision by University Hospital *physicians* to place plaintiff in restraints and to continue to restrain plaintiff during plaintiff's psychotic episode September 25-28, 2012 did not violate plaintiff's federal constitutional rights.   As a public employee,  identified by plaintiff as an employee of the Bexar County Hospital District's University Hospital as a nurse's aide, defendant James Last Name Unknown is entitled to the protection afforded by the doctrine of qualified immunity.   Plaintiff has alleged no facts sufficient to overcome the defense of qualified immunity with regard to this defendant's actions in complying with a prescribed form of treatment for an actively psychotic patient.   Plaintiff's claims against defendant James Last Name Unknown fail to allege sufficient facts to overcome the defense of qualified immunity and are frivolous.

Plaintiff alleges that defendant Keisha Last Name Unknown (1) took a bedpan from plaintiff's room and returned at some point later with a syringe filled with urine which she threatened to inject into plaintiff's arm and (2) told defendant Garcia she had given plaintiff food she had taken from the trash.[50]  Plaintiff does not claim to have personally witnessed this defendant fill the syringe in question with urine or to have any other rational basis for believing the syringe in question actually contained any substance not prescribed for plaintiff by a treating physician.   Nor does plaintiff claim to have personally witnessed this defendant take food from the trash and serve it plaintiff.  Moreover, plaintiff admits in his sworn original complaint that he did not eat any of the allegedly tainted food and this defendant never actually injected him with the allegedly tainted syringe.  This defendant, identified by plaintiff as a nurse's aide employed at University Hospital, is also entitled to the protection of qualified immunity.  Conclusory, delusional, allegations such as plaintiff's assertions against this defendant are insufficient to overcome the defense of qualified immunity and cannot withstand scrutiny under Section 1915(e)(2)(B) and 1915A(b)(1).

## XII. Plaintiff's State Tort Claims

Plaintiff states that he wishes to assert state tort law claims against defendants Bexar County and the Bexar County Hospital District d/b/a University Health System.[51]  For the reasons discussed

---

[50] Plaintiff's Original Complaint, filed September 29, 2014 (ECF 1-1) (handwritten addendum), at pp. 3 of 9 to 4 of 9.

[51] Plaintiff's Response to Bexar County Hospital District Motion to Dismiss, filed October 15, 2015 (ECF no. 104), at pp. 21-22; Plaintiff's response to Defendant Bexar County's Motion to Dismiss, filed October 15, 2013 (ECF no. 105), at pp. 21-22.  Insofar as plaintiff purports to assert state tort claims against the individuals named as defendants in this lawsuit, plaintiff's state tort claims are non sequitur.  Plaintiff has brought suit against the two local governmental entities which plaintiff alleges employed all the individual defendants named in his original complaint.  Applicable Texas law forecloses plaintiff from bringing suit against an

at length in Section IV above, plaintiff's federal civil rights claims against defendant Bexar County

fail to state a cause of action under Section 1983 and are properly subject to dismissal under Rule

12(b)(6).  Under such circumstances, pursuant to 28 U.S.C. § 1367(c)(3), this Court declines to

exercise supplemental jurisdiction over plaintiff's state law claims against defendant Bexar County.[52]

Plaintiff's state tort claims against defendant Bexar County will be dismissed without prejudice.

For the reasons discussed in Section IX above, plaintiff's federal civil rights claims against

defendant Bexar County Hospital District d/b/a University Health System are insufficient to

withstand this defendant's motion for summary judgment under Rule 56.  Under such circumstances,

pursuant to 28 U.S.C. § 1367(c)(3), this Court declines to exercise supplemental jurisdiction over

---

individual employee of the same governmental entity plaintiff has sued asserting claims arising
from the same operative facts which form the basis for his state law tort claims against the
governmental entity in question.  *See Bustos v. Martini Club, Inc.*, 599 F.3d 458, 463-64 (5th Cir.
2010) ("if a plaintiff brings virtually any state common law tort claim against both a
governmental unit and its employees, § 101.106(e) will allow the employee defendants to be
dismissed if the governmental unit so moves.  That this holding applies to intentional torts is
clear since the claim at issue in *Garcia* was one for intentional infliction of emotional distress,
and since the court expressly noted an earlier decision in which it had held that the previous
version of § 101.106 applied to intentional torts.").  Thus, insofar as plaintiff asserts claims of
intentional infliction of emotion distress and other intentional torts against the named individual
defendants, such as his claim of assault against defendant Garcia and his claim of intentional
infliction of emotional distress against defendant Keisha last name unknown, by simultaneously
filing suit against Bexar County and the Bexar County Hospital District, plaintiff effectively
pleaded himself out of his claims against the individual defendants.  *Id.*  Individuals may not be
sued under the Texas Tort Claims Act as that act does not govern suits brought directly against
an employee of the State.  *Goodman v. Harris County*, 571 F.3d 388, 394 (5th Cir. 2009), *cert.
denied*, 556 U.S. 1148 (2010),

[52] The Court also notes that, insofar as plaintiff seeks to assert claims against Bexar
County based upon the alleged intentional actions of any Bexar County employees, the Texas
Tort Claims Act is inapplicable.  The Texas Tort Claims Act does not apply to claims arising out
of an intentional tort.  *Goodman v. Harris County*, 571 F.3d 388, 394 (5th Cir. 2009), *cert.
denied*, 558 U.S. 1148 (2010).  Thus, insofar as plaintiff alleges claims premised upon the
alleged intentional infliction of emotional distress or an alleged assault, his state tort claims
against Bexar County and the Bexar County Hospital District are foreclosed by state law.

plaintiff's pendent state law claims against defendant Bexar County Hospital District.[53]  Plaintiff's

state tort claims against defendant Bexar County Hospital District will be dismissed without

prejudice.

Accordingly, it is hereby **ORDERED** that:

1.  The referral of this cause to the Magistrate Judge is **WITHDRAWN.**

2.  Defendant Bexar County's motion to dismiss, filed September 16, 2015 (ECF no. 81), is

**GRANTED**; all of plaintiff's claims against Bexar County are **DISMISSED WITHOUT**

**PREJUDICE.**

3.  Defendant Bexar County Hospital District d/b/a University Health System's motion for

summary judgment, filed September 18, 2015 (ECF no. 83), is **GRANTED as follows:** all of

plaintiff's federal civil rights claims against this defendant are **DISMISSED WITH PREJUDICE**;

all of plaintiff's state tort law claims against this defendant are **DISMISSED WITHOUT**

**PREJUDICE.**

4.  Defendant Summerville's motion for summary judgment, filed June 3, 2015 (ECF no. 27),

is **GRANTED;** all of plaintiff's claims against this defendant are **DISMISSED WITH**

**PREJUDICE.**

---

[53] As with plaintiff's state law claims against defendant Bexar County, insofar as plaintiff
seeks to assert state tort claims against defendant Bexar County Hospital District arising from
alleged intentional torts committed by employees of the Hospital District, plaintiff's claims are
foreclosed by the provisions of the Texas Tort Claims Act. *Goodman v. Harris County*, 571 F.3d
at 394.

5.  All of plaintiff's claims against defendants Keisha Last Name Unknown and James Last Name Unknown are **DISMISSED WITHOUT PREJUDICE** as frivolous, pursuant to Title 28 U.S.C. §§ 1915(e)(2)(B) and 1915A(b).

6.  Defendant Garcia's motion for summary judgment, filed June 18, 2015 (ECF no. 38), is **GRANTED;** all of plaintiff's claims against this defendant are **DISMISSED WITH PREJUDICE**.

Final judgment may be entered accordingly, and this case may be closed.

**SIGNED this** _____ **day of November, 2015 at San Antonio, Texas.**

**ORLANDO L. GARCIA**
**UNITED STATES DISTRICT JUDGE**

98